173 F.2d 944 (1949)
In re CALTON CRESCENT, Inc.
MANUFACTURERS TRUST CO.
v.
BECKER et al.
No. 111, Docket 21112.
United States Court of Appeals Second Circuit.
March 3, 1949.
Writ of Certiorari Granted June 6, 1949.
*945 Beckman & Bogue, of New York City (Edward K. Hanlon and Bertrand L. Kohlman, both of New York City, of counsel), for appellant.
David W. Kahn, of New York City, for appellees.
Roger S. Foster, Gen. Counsel, of Washington, D. C., George Zolotar, of New York City, and David Ferber, of Philadelphia, Pa. (W. Victor Rodin, of Philadelphia, Pa., and Ezra Weiss, of New York City, of counsel), Special Counsel, for Securities and Exchange Commission as amicus curiae.
Before L. HAND, Chief Judge, SWAN and CHASE, Circuit Judges.
Writ of Certiorari Granted June 6, 1949. See 69 S.Ct. 1170.
*946 SWAN, Circuit Judge.
This appeal brings up for review an order with respect to the claims of three creditors, the appellees, in an arrangement proceeding under Chapter XI of the Bankruptcy Act, 11 U.S.C.A. § 701 et seq. The debtor, Calton Crescent, Inc., was formerly the owner of an apartment house located in New Rochelle, New York. In January, 1946, it sold the apartment house, which was its only property, and in May 1946 filed its petition for arrangement. Thereafter the purchase price received for the property was converted into cash, and the debtor is now able to pay a dividend in its arrangement proceeding of 43.61% to the holders of its debenture bonds. The appellees, being the holders of certain of such bonds, filed claims based thereon for the face amount thereof. The appellant, Manufacturers Trust Company as trustee under the indenture pursuant to which the debenture bonds were issued and in its individual capacity as a creditor,[1] filed objections to the appellees' claims on the ground that the circumstances under which their bonds were acquired make it equitable to subordinate their claims to those of the other debenture holders so as to limit the dividends payable to the appellees to what the bonds actually cost them. The referee in bankruptcy dismissed the objections and allowed the appellees claims at their face amount. This order was confirmed by the district court, 80 F.Supp. 822, and the objector has appealed. The legal questions presented are, first, whether the issue as to subordination is to be determined by state law or federal law and, second, whether, under the law found applicable, the appellees' dividends should be limited as the objector contends.
As to the first question the appellant is right  federal law controls the distribution to creditors in bankruptcy. The Supreme Court has declared the rule very definitely. In Prudence Realization Corporation v. Geist, 316 U.S. 89, at page 95, 62 S.Ct. 978, at page 982, 86 L.Ed. 1293, the court said; "* * * The court of bankruptcy is a court of equity to which the judicial administration of the bankrupt's estate is committed, Securities and Exchange Commission v. United States Realty & Improvement Co., 310 U.S. 434, 455-457, 60 S.Ct. 1044, 1053, 1054, 84 L.Ed. 1293, and it is for that court  not without appropriate regard for rights acquired under rules of state law  to define and apply federal law in determining the extent to which the inequitable conduct of a claimant in acquiring or asserting his claim in bankruptcy requires its subordination to other claims which, in other respects, are of the same class."
Later cases have reiterated the rule. American Surety Co. v. Sampsell, 327 U.S. 269, 272, 66 S.Ct. 571, 90 L.Ed. 663; Heiser v. Woodruff, 327 U.S. 726, 732, 66 S.Ct. 853, 90 L.Ed. 970; Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 161-163, 67 S.Ct. 237, 91 L.Ed. 162. For earlier cases on the general subject, see Pepper v. Litton, 308 U.S. 295, 303-304, 60 S.Ct. 238, 84 L.Ed. 281; American United Mut. Life Ins. Co. v. City of Avon Park, 311 U.S. 138, 146, 61 S.Ct. 157, 85 L.Ed. 91, 136 A.L.R. 860. From these decisions we understand the rule to be that, although the state law determines the title, validity and amount of a claim, the bankruptcy law, including what federal judges think to be equitable, determines what dividends shall be distributable to the claimant. In other words, in addition to those modifications which the Bankruptcy Act itself has imposed upon distribution with respect to preferences, priorities and the like, the courts must impose any other modifications which they deem necessary in the interest of justice.
In the case at bar validity and amount of the bonds held by the appellees are not in dispute; nor is the legal title. The appellant does contend, however, that it is inequitable to allow them to recover full dividends. The amount of their respective claims and the cost thereof are as follows:

 Face am't
 Claimant of bonds Cost
 Regine Becker $44,500 $3,060.63
 Emily K. Becker 52,800 5,010.00
 Walter A. Fribourg[2] 50,000 2,124.80

*947 The aggregate dividend payable upon the three claims amounts to $64,237.53, while the aggregate cost of their bonds to the claimants was only $10,195.43. The difference, namely, $54,042.10, the appellant contends, must be distributed under equitable bankruptcy principles to the other holders of debenture bonds. These holders whose bonds aggregate $107,150 (including the $5,000 of bonds mentioned in note 2, supra) will therefore receive approximately 94% of the face value of their claims. Before passing to a consideration of the equitable principles which are said to require this rather extraordinary result, a statement of the facts should be made.
The debtor was organized in 1933 to take title to the New Rochelle apartment house pursuant to a plan of reorganization necessitated by the foreclosure of a mortgage executed in 1927. Under this plan a new first mortgage of $175,000 was placed on the property and the debtor issued its debenture bonds, in the authorized principal amount of $256,800, which were to mature in 1953 and to bear interest, not exceeding 6% per annum, if declared by the directors out of net earnings for each calendar year. These bonds, together with the debtor's capital stock, were issued to the holders of participation certificates in the old 1927 mortgage, one share of stock and $50 of debenture bonds being exchanged for each $100 of participation certificates. The total amount of debentures issued was $254,450, debentures of the face amount of $2,350 being retained for certificate holders who had not deposited their certificates. No interest has ever been paid on the debenture bonds.
Early in 1942 the debtor submitted to its shareholders an offer from a prospective purchaser to pay $220,000 for the apartment house, but the proposed sale did not obtain the requisite approval by the stockholders. Had the sale been approved the debenture bondholders would have received about five cents on the dollar on the face amount of their bonds. One who opposed the sale was Sanford Becker, the holder of 50 shares of stock and $5,000 face amount of debentures. Being in default under its first mortgage the debtor was in a precarious condition. Sanford Becker offered to find a client who would lend the debtor $15,000 upon a second mortgage on condition that he and his brother Norman Becker be given places on the debtor's five man board of directors and be allowed to select the real estate agent to manage the property; the debtor imposed the further condition that all shareholders and debenture holders be given an opportunity to participate in the proposed second mortgage. In April 1942 this offer was accepted by the debtor, but none of its shareholders or debenture holders except Fribourg, availed themselves of the opportunity to participate in the second mortgage. The Becker brothers were then elected directors; Sanford became treasurer and Norman secretary, and Mr. Kelly continued as president. Sanford Becker's clients who lent the money secured by the second mortgage were his mother, Regine Becker, his wife, Emily K. Becker and his friend, Walter A. Fribourg. They each advanced $5,000.[3] Neither of the Becker ladies was a shareholder or debenture holder at this time; Fribourg had shortly before acquired 50 shares of stock and $5,000 of debentures.[4] On three occasions thereafter, when the debtor again came into default under its first mortgage, the appellees advanced further sums, aggregating about $8,000, to enable such defaults to be cured.[5] These further advances were repaid without interest during 1945. The second mortgage was always in default from the end of 1942 but the appellees never threatened to foreclose it and, after the debtor's property was sold in January 1946, it was paid in full with interest. In October 1943 when both the first and second mortgages were in default the appellees obtained an assignment of rents;[6] the *948 property, however, continued to be operated, as before, by the same managing agent. In the summer of 1944, the three directors other than the Becker brothers, sold their stock and debentures and resigned as officers and directors of the debtor. Their places as directors were filled by nominees of the Becker brothers, and Norman Becker became president in place of Mr. Richard Kelly.
There is no contention that the conduct of the appellees above recounted was "inequitable." It was obviously very beneficial to those debenture holders who retained and have proved their bonds in the arrangement proceeding. It forestalled foreclosure by the first mortgagee, and enabled the debtor to retain its property until it could be sold for a price of $300,000, which is enough to enable all debenture holders to receive a dividend of 43.61% on the face amount of their bonds. No complaint is made as to the price at which the debtor sold, nor is it suggested that the debtor should have sold sooner at a lesser price or have postponed the sale in the hope of obtaining a better price.
The "inequity" which is said to require that the dividend distributed to the appellees be less than that payable to the other bondholders arises out of the time when, and manner in which, the appellees acquired their bonds. At all times when the bonds were purchased by or for them the debtor was insolvent in the bankruptcy sense.[7] During the period between April 1942 when the Becker brothers became directors, and the date when the debtor filed its petition for arrangement, May 23, 1946, the appellees acquired the bonds upon which their claims are based.[8] Their own money was used in buying these bonds and neither of the Becker directors had any financial interest in the debentures bought by the appellees. Regine Becker bought her $44,500 of debentures between February 2, 1944 and August 30, 1945 inclusive, from E. Henry Sondheimer Company, a broker who dealt in over-the-counter securities. Sondheimer had originally acquired them for Fribourg but as the latter did not want them they were bought by the Becker ladies. Emily K. Becker bought her $52,800 of debentures between May 24, 1944 and February 5, 1945 inclusive; $7,750 were bought from the Sondheimer Company in the same manner as were Regine Becker's; $37,500 from the King estate which was represented by Reynolds, Richards & McCutcheon, one of whose partners was a director of the debtor; and $7,550 from the Y. W. C. A. through one Clay, a member of the Association's investment committee and also a director of the debtor, who was kept fully informed of the debtor's financial condition. Fribourg's $50,000 of debentures were acquired between July 31, 1942 and June 4, 1946, inclusive. Many of Fribourg's debentures were bought from the Sondheimer company or other brokers. $8,250 were acquired from Mr. Kelly when he resigned as president and a director in 1944. He insisted that the offer made to him by Fribourg in the name of the latter's brother-in-law, one Charles G. Winter, be extended to all the debenture holders, and Kelly notified all stockholders of the offer and of his intention to accept it. Some of Fribourg's holdings were acquired as a result of that offer. Another $8,500 were purchased from Mr. Hays, vice-president of the debtor. The Becker ladies in investing their money in the debentures exercised no independent judgment; their bonds were bought for them by Sanford or Norman Becker. The former was optimistic about the future of the debtor and thought that the termination of the war would be followed by an enhancement of the value of its property. Norman Becker was pessimistic and discussed his point of view with his mother and Fribourg. Fribourg testified that he invested in the debentures as a "gamble" on his own judgment. He apparently obtained some information from the Becker brothers, in whose office he had *949 desk room, since he furnished Sondheimer with a list of the debenture holders which Sondheimer used in sending them inquiries as to whether they would sell. During the period when the appellees were purchasing their debentures the debtor was receiving frequent inquiries from brokers as to terms on which its property might be bought, but no "firm" offer to buy was submitted after the offer rejected by the shareholders in 1942 until receipt of the $300,000 offer which the debtor accepted in January 1946. The referee concluded that the proofs of debt filed by the Becker ladies should be treated as if they were proofs of debt filed by directors, but that Fribourg's proof of debt should not be so treated. The district court concluded that his claim also should be treated as filed by a director.
One contention of the appellant is that the appellees are disqualified from profiting by their transactions in the debtor's securities because they acquired them by using information obtained from the Becker directors without adequate disclosure to the sellers. The non-disclosure is said to consist in failure to inform the sellers of (1) the inquiries of brokers as to the terms on which the property might be purchased; (2) the fact that the appellees were the owners of the second mortgage taken in the name of Baset Realty Corporation; and (3) the fact that they were purchasing debentures. The referee stated that a finding that overreaching or concealment was practiced in the purchase of the securities was not warranted,[9] and the district court said that the record did not show this finding clearly erroneous. The appellant wishes us to overrule this finding, but we agree with the district judge that it is not shown to be clearly wrong.
Furthermore, it should be observed that no seller is complaining that he was overreached in parting with his securities, as was the case in Strong v. Repide, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853, upon which appellant puts great reliance. Such sellers as the King Estate, Kelly, Hays and the Y. W. C. A. had as full information as to the debtor's financial condition and the prospect that its property might increase in value after the end of the war as did the appellees. As to securities purchased from over-the-counter traders, such as the Sondheimer Company and other brokers we should hesitate to lay down the rule that the purchaser from a broker must make disclosure of why he thinks the purchase a desirable investment under penalty of being charged with overreaching if he fails to do so.
The appellant's other line of attack rests on two premises, (1) that because of the appellees' relationship to the Becker directors they can stand no better than the Becker brothers themselves would stand if they had invested their own money in the purchase of the securities, and (2) that under equitable principles it is a breach of fiduciary duty for a director to buy the company's securities during its insolvency, and consequently he cannot be allowed to make a profit from such purchases.
For the moment we pass the first premise and direct attention to the second. It is, of course, axiomatic that a fiduciary will not be permitted to profit at the expense of his cestui from any transaction where his fiduciary duty and his personal interest may come into conflict.[10] This principle, however, does not preclude a director from purchasing a claim at a discount and collecting its face amount, if his company is solvent, since who holds the *950 debt can be of no concern to a solvent company. It is not immediately apparent why insolvency should make a difference. It will cost the debtor no more whether the dividend which it may be able to pay creditors goes to the original holder of the debt or to a director-assignee. Counsel for the Securities and Exchange Commission suggests that insolvency creates a possible conflict between duty and personal interest because the directors can choose the time for filing a bankruptcy petition and may accelerate or postpone it if doing so can result in a personal profit. The argument as to the timing of bankruptcy has no force after the petition has been filed, yet the law is better settled with respect to purchases made after the petition is filed than those made before.[11] After insolvency it may be said that the directors are fiduciaries for the group of creditors who will share in the insolvent's estate. But the creditors who have retained their claims will suffer nothing whether or not the director is allowed to make a profit from his purchases. If a wrong has been done to any of the group of cestuis, it is to those who sold their claims at a price less than the dividend they would have received had they retained them. If they were suing for the wrong done them, they would have to show something equivalent to a fraudulent non-disclosure. Strong v. Repide, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853. Plainly if the contest for the director's profits was between the wronged cestuis and the unwronged cestuis, the former should prevail. Where it is between the unwronged cestuis and a director, if the former are allowed to prevail it can only be as a disciplinary measure against the director for wronging someone who has not complained of the wrong. That this is the real basis for the rule was recognized by Judge Kirkpatrick in the case of In re Real Estate Mortgage Guaranty Co., D.C.E.D.Pa., 55 F. Supp. 749, 752, where he said: "* * * The doctrine that a receiver may not retain a personal profit made out of his trust is a prophylactic rule. It implements the law's precept that a trustee must give undivided loyalty to his trust. The surcharge is the sanction. * * * In the present case a substantial majority of the ultimate and only beneficiaries of the trust knew of and consented to the receivers earning these commissions by placing the insurance through his own agency. I think that is a controlling factor and that it gives the court full discretion to deny the surcharge."
The same judge made a similar statement in Re Philadelphia & Western Ry. Co., D. C., 64 F.Supp. 738, 741: "This limitation is not imposed upon the theory that such profits belong to the corporation by reason of any property right that it may have in them but is an administrative sanction for the enforcement of the rules of fiduciary conduct set by the law." If the doctrine be recognized as a disciplinary sanction within the discretion of the court to impose or withhold, then, as Judge Kirkpatrick also said in the Mortgage Guaranty Co. case, "Each case depends on its own circumstances". In the case at bar, where there was no overreaching of the sellers, we are not convinced that the circumstances are such as to require imposition of the sanction, even if the proof of debt had been filed by a director of the debtor.
But if we are wrong as to this, and the federal rule, in the case of a director who buys the company's securities after it has become insolvent, is as strict as the appellant contends and requires that he be disciplined by giving his profit to creditors whom he has not wronged, the rule must be extended even further if the appellees are to be limited to the cost of their debentures. We now come to consideration of the premise that the appellees can stand no better than would the Becker directors were they the claimants. This is a question of law upon which the conclusions of the referee and district judge are not controlling on appeal.
The appellees were not directors or officers of the debtor; their own funds were invested, and no officer or director of *951 the debtor has any interest in the debentures they purchased. In the case of In re Philadelphia & Western Ry. Co., D.C.E.D. Pa., 64 F.Supp. 738, 741, the court declined to limit the claim of J. Prescott Stoughton who was the father of an officer of the debtor corporation. In so ruling he stressed the fact that the father was not a fiduciary who owed a duty to the debtor, that the purchases were made by the father with his own funds and for his sole account, and that neither the son nor any other person associated with the debtor had any interest in his dealings in the bonds of the debtor. For similar reasons he declined to limit the claim of Agnes C. McKernan who was an officer of the Conway Corporation which had a management contract with the debtor for the management of the debtor's business. These two claims present a closer analogy to the purchases at bar than do any of the other cases brought to our attention. It is true that one who "knowingly confederates" with a fiduciary in a breach of trust is not allowed to make a profit from the transaction. Jackson v. Smith, 254 U. S. 586, 589, 41 S.Ct. 200, 65 L.Ed. 418. But "knowingly confederating" means more, in our opinion, than investing one's own funds on a "tip" received from an officer or director of a debtor. With respect to Fribourg we see nothing in the record to justify a finding that he did more than this. As respects the Becker ladies, since they exercised no independent judgment in the investment of their funds, they are chargeable with the knowledge of their agent, Sanford Becker. But since there was no overreaching of the sellers when he made the purchases for his wife and mother, we do not think the disciplinary sanction for "knowingly confederating" with a disloyal fiduciary should be imposed.
Viewing the situation broadly it appears that the second mortgage loan and the subsequent advances made by the appellees staved off foreclosure and made possible the 43.61% dividend now available for all debenture holders. Although the debtor had long been insolvent in the bankruptcy sense, it does not appear that bankruptcy proceedings were at any time contemplated before the filing of the arrangement petition in May 1946. Prior to that time the appellees acquired debentures from owners who were willing to sell and were not overreached. These circumstances do not seem to a majority of the court to afford adequate reason to limit the appellees' dividends to the cost of the bonds and to transfer the balance as a windfall to the other debenture holders. Accordingly the order allowing their claims in full is affirmed.
L. HAND, Circuit Judge (dissenting).
I agree with my brothers that the decisive question is not one of New York law, but  so far as I can understand  what federal judges think a "fair" distribution between the bankrupt's creditors would be of the salvage from his estate. I can see an apparent anomaly in distributing the profits on a director's purchase among the creditors at large, when they cannot be returned to the seller. However, it appears to me an excuse for doing so that, if equity regards the bonds as improperly acquired, it is more nearly just to distribute any profits among the other creditors, who have not been paid in full, than to leave them in the director's hands; for they are a part of the bankrupt's assets and the creditors have a better claim to them than the director himself. The fact that the former creditor has not intervened to assert his right to them against the director, is not to be taken as the equivalent of an assignment or release.
Whether any of the bonds here in suit were in fact acquired by means which equity regards as improper is another matter. I agree that the trustee's case broke down, so far as it rested upon the suppression of any specific information that the property was going to increase in value; and, if the directors' dividends are to be confined to what they paid for the bonds, it must be because, as directors, they were not free to deal with the creditors at arms' length. The books are full of declarations that an insolvent holds his property in trust for his creditors; and, when the insolvent is a corporation, whose directors were concededly fiduciaries as to shareholders, they become doubly fiduciaries of the creditors upon insolvency. The shareholders have then lost any interest *952 in the assets, and the directors must be fiduciaries of the creditors, if they are to be fiduciaries at all. We can start therefore with the principle universally recognized that, prima facie, no fiduciary deals with his beneficiary on terms of equal advantage; and that, if he is to avoid that restriction, he must be able to point to some special circumstance which will excuse him. The claimants in the case at bar argue that, since directors may freely buy shares in the market, they must be equally free to buy debts from creditors after insolvency, when, as I have just said, creditors step into the place of shareholders. That there is at least a prevailing belief in the federal courts to the contrary, the decisions discussed in my brothers' opinion make clear; they form a substantial body of opinion, which Securities and Exchange Commission v. Chenery Corporation[1] did not disturb.
It seems to me that there are solid grounds for distinguishing between such purchases and purchases of shares. I conceive that the law allows a director to increase his stake in the company, because it adds to his incentive to make it succeed; the greater the prize, the greater the effort; it will dampen his zeal, if his holdings must be frozen at what he has when he is elected. Yet he cannot increase them without buying of the shareholders. The common-law was unable to effect any compromise between these opposing considerations, and chose the second; on the other hand, the Securities Exchange Act[2] succeeded better by forbidding "quick turns" in shares by a director, yet circumscribing his freedom no further. When the company is in process of liquidation, I can see no excuse for allowing the purchase of debts, because, although the director acquires an interest, or an added interest, in the success of the liquidation, he has little or no control over the event, for it is in the hands of the court. Any added incentive which his purchase may contribute is negligible; and the excuse does not exist. Indeed, it is significant that the decisions are clearer against such a purchase than against one made while the company continues as a "going concern." When it does so continue, I doubt if the answer can be put in general terms. The insolvent company may have a good chance of effecting a composition: that is, it may be able to scale down its debts and go on. When that is so, I do not see why the same reasoning which permits a director to buy shares should not allow him to buy up debts. Nevertheless, I should make a distinction between the two situations. Before accepting the excuse in the case of debts, I would put the burden on the director of proving, not only that he genuinely expected by a composition to continue the business, but that his expectation was well founded; and nothing short of both would serve as an excuse. In the case at bar neither was proved, and on this record some at any rate of the purchases appear to me to have been unjustified. Perhaps, if my views had prevailed, it would have been necessary to send the case back for a trial on the issue I have indicated, but I need not decide that.
It will not be necessary for me to go much into the details. I should not include any bonds bought by a director from a director; surely they stand on an equality. The case is not so plain as to the ladies for whom directors bought bonds. They relied altogether upon the directors' advice and exercised no judgment of their own in deciding to buy. In so doing I think that they became charged with the same equities that would have charged the directors, had they bought on their own behalf. In short, the directors could not pass on to their principals profits which they could not have retained for themselves. The principals were charged with notice of what the agents knew, and therefore the principals were not bona fide purchasers. Finally, it is not important to decide whether Judge Goddard was right in finding that Fribourg's claim should be treated as though it were a director's; or whether the referee was right in deciding otherwise. The correct answer is not altogether clear, and it would be necessary to find it only in case my brothers agreed with my disposition of the chief issue.
NOTES
[1] Its claim as a creditor in the sum of $1,587.50 represents fees and disbursements due it as indenture trustee.
[2] Fribourg's claim as filed was for $55,000. Objection was withdrawn as to $5,000 of bonds acquired by him under circumstances which the objector concedes entitle him to the full dividend thereon.
[3] The second mortgage was taken in the name of Baset Realty Corporation but it was a mere title holder for the appellees.
[4] These are the debentures mentioned in note 2 supra.
[5] To pay overdue taxes $3,615.54 was advanced in September 1943, $2,305.09 in April 1944, and $2,001 in October 1944.
[6] This, like the second mortgage, was taken in the name of the Baset Realty Corporation.
[7] Finding 55. Insolvency probably existed throughout the entire period of the debtor's ownership of the apartment house property, but the referee made no finding as to insolvency during earlier years.
[8] Except for one $500 bond purchased by Fribourg at a cost of $131.05 on June 4, 1946.
[9] This was finding 54. There is also finding 30: "There is no evidence to support a finding that Fribourg in connection with his purchases was acting on any information of an inside nature imparted to him by any officer or director of debtor  something not known to and of which the stock holders were not informed."

And finding 40: "The record does not warrant a finding of offers to purchase the debtor's said property for sums increasing in amount from the Spring of 1942."
And finding 43: "From the time that the Chesterbrook Estate offer was turned down until the time of the sale in 1946, nothing which would be called an actual firm offer was made for debtor's property."
[10] Magruder v. Drury, 235 U.S. 106, 119, 35 S.Ct. 77, 59 L.Ed. 151 is often cited for this well-known principle.
[11] In most of the cases cited by appellant the purchases were made after some type of bankruptcy proceeding was pending or was imminent and known to be so by the director. Monroe v. Scofield, 10 Cir., 135 F.2d 725, 726; In re Philadelphia & Western Ry. Co., D.C.E.D. Pa., 64 F.Supp. 738, 739; In re Los Angeles Lumber Products Co., D.C.S.D. Cal., 46 F.Supp. 77, 82.
[1] 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626.
[2] § 78p (b), Title 15 U.S.C.A.