313 F.2d 39
 J. H. W. SMALL, Trustee in Bankruptcy, acting for Morse-Parker Motor Supply, Inc., et al., and all other creditors of Armstrong Freight Lines, Inc., Bankrupt, Appellant,
v.
Samuel U. WILLIAMS, claimant, Appellee.
 No. 8740.
 United States Court of Appeals Fourth Circuit.
 Argued November 9, 1962.
 Decided January 9, 1963.
 
 William C. Worthington, Norfolk, Va., and J. Herbert W. Small, Elizabeth City, N. C. (C. B. Small, Elizabeth City, N. C., and William N. Stovall, Suffolk, Va., on brief), for appellant.
 Dewey W. Wells and J. Henry LeRoy, Elizabeth City, N. C. (LeRoy, Wells & Shaw, Elizabeth City, N. C., on brief), for appellee.
 Before HAYNSWORTH and BOREMAN, Circuit Judges, and BUTZNER, District Judge.
 HAYNSWORTH, Circuit Judge.
 
 
 1
 The principal question arises out of the allowance by the bankruptcy court of the secured claim of the President and dominant stockholder of the Bankrupt. Upon various grounds, it is contended upon behalf of the Trustee that the claim should be deferred to the claims of all general creditors. We think the claim was properly allowed as a secured claim, but we conclude that the officer-stockholder received a certain preferential payment.
 
 
 2
 Armstrong Freight Lines, Inc., the Bankrupt, was organized in January 1958 pursuant to a rather elaborate agreement entered into between Samuel U. Williams, on the one hand, and C. Earl Armstrong and Beryl D. Armstrong, on the other. For some years the Armstrong brothers, holding proper certificates of convenience and necessity, had engaged in trucking operations in a number of states. They had encountered financial difficulties, and, by January 1958, the partnership was insolvent. The partners turned to Mr. Williams for help.
 
 
 3
 The agreement between the Armstrong brothers and Williams provided for the formation of a corporation, to which all partnership assets would be transferred, subject to partnership liabilities. Mr. Williams agreed to subscribe to 51% of the stock and to pay $5100 for it, while each of the Armstrong brothers agreed to purchase 24½% of the stock and to pay $2450 for it. In addition, Mr. Williams agreed to lend to the corporation $60,000, secured by a chattel mortgage upon personal property of the corporation and by five judgment notes, each in the amount of $12,000. The indebtedness was to be repaid at the rate of $12,000 per year for five years, and interest at the rate of six per cent per annum was payable quarterly.
 
 
 4
 In accordance with the agreement, Williams paid into the corporation $5100, for which he received stock, and $60,000, for which he received five notes of the corporation, each in the face amount of $12,000. The Armstrong brothers did not pay in the $4900 they had agreed to pay for their stock. Because the corporation was thought to be in need of the cash, Mr. Williams advanced $4900 to the corporation, for which he received a sixth note in that amount.
 
 
 5
 The corporation confessed judgment upon each of the Williams notes, and these judgments were duly entered of record in Gates County, North Carolina, where the corporation had its principal place of business. The chattel mortgage, securing the six notes, was also properly recorded in Gates County, North Carolina, though because of the illness of one of the Armstrong brothers who had to sign it as Secretary, it was not filed for record until almost a month after its partial execution.
 
 
 6
 After the corporation was organized, Williams contacted all of the general creditors of the partnership, except one of whose claim he was uninformed. All of those contacted agreed to compromise their claims at fifty cents on the dollar, and all of the unsecured claims against the partnership, with the one exception, were settled by payment on that basis, so that, thereafter, the only remaining debts were certain claims secured by liens upon equipment, the secured claim of Williams, the newly incurred obligations of the corporation arising out of current operations, and the one old, small unsecured claim of which Williams was unaware.
 
 
 7
 For some months the corporation paid its current bills promptly. It was unable to pay all of its bills in May 1958, however, and there then developed differences between Williams and the Armstrongs. These differences centered principally around the insistence by Williams that the salaries, which the three of them had been drawing, should be reduced in amount, and that the current creditors should be informed of the situation. On June 7, 1958, Williams did write to all creditors informing them that Armstrong was then unable to pay its obligations for April and May, and asking that it be allowed to purchase goods and services on a cash basis until the accrued obligations could be liquidated.
 
 
 8
 Thereafter, some of the corporation's equipment was seized under attachments, and on August 15, 1958, Williams, on behalf of the corporation, filed a voluntary petition in bankruptcy.
 
 
 9
 Williams filed with the Trustee a claim on the five notes aggregating $60,000. He claimed as a secured creditor to the extent of the value of the security, which was estimated to be $34,000.[1] His chattel mortgage did not reach cash, receivables and certain of the personal property, so that he also claimed as a general creditor to the extent that the total claim exceeded the value of the security.
 
 
 10
 A hearing was held before the Referee as to the allowance of the Williams claim. Before he disposed of the matter, however, he was succeeded in office by another man, and the new Referee determined the issues on the basis of the record made before his predecessor. He concluded that the claim should be allowed, and the District Judge has joined in and confirmed his findings of fact and his conclusions of law.
 
 
 11
 At the outset, it is contended that Williams concealed from the creditors the fact that he took security for the $60,000 advanced by him, or falsely represented that all of the funds he expected to put into the corporation would be contributed as equity capital.
 
 
 12
 Undoubtedly Williams, in arranging credit for the new corporation, made representations that the business, after its incorporation and the composition of the claims against the old partnership, would be "soundly financed." Two creditors testified that they were left with the impression that all of Williams' investment in the business would be in stock, but they were vague in their recollections, and they could testify to no specific statement that could be characterized as a misrepresentation. There was other testimony that Williams truthfully and fully informed those who inquired as to the details of the method by which the new corporation would be financed and operated, and it is undeniable that the judgments on the notes and the chattel mortgage were spread upon the public records. Under these circumstances, we are bound by the finding of fact that Williams perpetrated no fraud and made no misrepresentation of any material fact in dealing with the creditors.
 
 
 13
 It is suggested that since the finding was originally made on a cold record by a newly appointed referee who had not heard the testimony, his finding is deprived of the presumption of correctness. That may have been the case in the District Court,[2] but when the District Judge has approved and adopted the finding, we do not undertake to rehear the underlying factual controversy de novo. Our jurisdiction is appellate only, and we accept the finding of the District Judge, for it is abundantly supported by the record.
 
 
 14
 It is contended, nevertheless, that the bankruptcy court, as a court of equity, ought to have subordinated the Williams claim because of the dominant position of Williams in the corporation,[3] which, it is said, was under-capitalized and insolvent from the beginning. Reference is made to the principle of Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281.
 
 
 15
 Advances by a dominant stockholder to the corporation he controls, though in the form of loans, may be treated as contributions to capital, if that appears to have been the real intention, or if, under established equitable principles, recognition of the debtor-creditor relationship would work a fraud upon others. Neither in law nor in equity, however, is there any rule of general impropriety in the extension of credit by a dominant stockholder to his corporation.[4] Indeed, available credit may be essential to the success of the enterprise and, when a closely held corporation is unable to obtain the credit it needs from banks, its own stockholders, their families and friends, are the most logical source of the needed funds. When a debtor-creditor relationship was clearly intended and the conduct of the parties has been entirely consistent with that relationship, no more can be said than that the bankruptcy court should scrutinize the transaction "with a large measure of watchful care"[5] and withhold its aid to the claimant unless it is satisfied that there was no want of good faith in the effectuation or in the implementation of the transaction.
 
 
 16
 Williams' dealings with the corporation readily withstand the test, as found by the Referee and the District Judge. There was no effort upon his part to secure a pre-existing and dormant claim.[6] There was no attempt by Williams to divert income and assets from the corporation into some other corporate pocket.[7] The District Court has found there was no concealment. Williams took the security contemporaneously with his advance of the money, and he did so in pursuance of a formal agreement which had been entered into after negotiations at arm's length with the two partners who had previously operated the business. He promptly paid for the stock, for which he had subscribed, and advanced additional funds to the corporation when the Armstrongs failed to pay for theirs. Altogether, he put into the corporation $70,000, of which $64,900 was secured by assets which turned out to be worth no more than $35,000. Since he had no previous connection with the business, he obviously exposed himself to risk of substantial loss only because he was convinced that the business could be operated successfully. The fresh money which he supplied to the business was actually used to compromise and liquidate all of the unsecured claims against the old partnership, and left the corporation with sufficient funds to conduct its business and to promptly pay its current expenses until May, when, apparently, because of operating losses, it again found itself in financial difficulty.
 
 
 17
 In these circumstances, there are none of the indicia of fraud. Williams came into the corporation only pursuant to the agreement negotiated in advance with the Armstrongs, and, pursuant to that agreement, he became a stockholder, paying for his stock, and a secured creditor, for which he gave full cash consideration. So far as the $60,000 is concerned, he thereafter did nothing to prefer himself over other creditors or to disadvantage the general creditors in any way. On the contrary, he was sufficiently solicitous of their interest to write to them on June 7, 1958, advising them of the financial embarrassment of the corporation, though he then might have remained silent and obtained further credit.
 
 
 18
 Under these circumstances, the findings and conclusions of the Referee, confirmed by the District Court, that Williams acted in good faith are amply supported, and we find no basis for deferment of the Williams claim.[8]
 
 
 19
 Another contention is made that Williams reduced the capital of the business, but the contention is misconceived. All of the partnership assets went into the corporation. In addition, Williams paid in $5100 in cash for his stock and the Armstrongs obligated themselves to pay in $4900 for their stock. When the claims of the partnership's general creditors were settled for fifty cents on the dollar, the working capital was increased by one-half of the aggregate of the settled claims. Everything that was done increased working capital; nothing was done to decrease it or to divert or withdraw any asset from the business.
 
 
 20
 Apparently, the contention is premised upon the fact that partnership assets which would have been available to partnership general creditors were subjected to the chattel mortgage securing Williams' advance of $60,000, but that was not a reduction of capital. Had the corporation been able to negotiate a secured loan with a bank, using the proceeds to settle the claims of the old partnership's general creditors, it could be said that a larger proportion of the assets of the business were subject to specific liens than had been the case theretofore, but that is no basis for an attack upon the bona fides of the transaction or for a deprivation of the lender's security.
 
 
 21
 There is an alternative attack, in which it is charged that the chattel mortgage given to Williams was a fraudulent conveyance, and it is said that the Trustee may attack it as such because one claim for $490 against the old partnership was not paid, since Williams was uninformed of it. Apparently, this contention is related to the argument considered immediately above, but it is groundless. Clearly Williams gave full and fresh consideration for the security he received. There was no antecedent debt which he sought to secure, for his payment of the money was substantially contemporaneous with his taking of the security, and the money was paid and the security taken pursuant to the precedent agreement between him and the Armstrongs.
 
 
 22
 We conclude that the Williams claim was properly allowed.
 
 
 23
 There is an unrelated question of preferential payments made to Williams on the eve of bankruptcy.
 
 
 24
 A few days before the petition was filed, Williams paid to himself $4900, being the amount which he had advanced to the corporation when the Armstrongs failed to pay their stock subscriptions. He also paid to himself $973.50, said to have been interest accrued upon the indebtedness to him, and there was a third check in the amount of $115.68, the purpose and ultimate disposition of which are not apparent on this record. The Trustee questioned all three checks as unlawful preferences.
 
 
 25
 When the Referee scheduled a hearing upon the question of the allowance of Williams' claim as a secured creditor, evidence was received relating to the $4900 advance by him and its repayment to him on the eve of bankruptcy. The Referee considered the contention that the repayment of that advance was an unlawful preference, but he did not consider the other two items. He concluded that the payment of the $4900 to Williams was not an unlawful preference, because it was a payment upon a valid, secured claim, for the chattel mortgage purported to secure that note representing that advance as well as the notes representing the $60,000 loan. That conclusion was affirmed by the District Court, but, we think, erroneously.
 
 
 26
 It is well-established, of course, that payments upon a preferred claim which have the effect of releasing assets of comparable value to the claims of general creditors are not preferential. They are not preferential because they do not deplete the debtor's estate or diminish the assets available for distribution among the general creditors. When the value of the security is substantially less than the secured claim, however, a partial payment upon the secured claim which does not effect a release of any of the security or reduce the claim to the extent that it is effectively secured, does result in a depletion of the debtor's estate.[9] Indeed, here, Williams filed his claim as a secured creditor to the extent of the value of the security, being approximately $34,000, and as an unsecured creditor to the extent of the excess of his claim above the value of the security. The payment of the $4900, of course, was applied to the unsecured portion of his claim and did not reduce in any degree his claim to the extent that it was effectively secured. The result is that, insofar as he claims as a general creditor, he has received a larger proportion of unpledged assets than other general creditors.
 
 
 27
 Under these circumstances, we conclude that the payment of the $4900 was an unlawful preference. Williams should be required to restore that amount, but, after restoration, allowed to increase his claim by $4900.
 
 
 28
 Since neither the Referee nor the District Court has considered the other two payments, we do not consider them, but, upon remand, the Trustee will be free to initiate such further proceedings as to them as he may think appropriate.
 
 
 29
 The judgment of the District Court, insofar as it allows the Williams claim in preference to the claims of the general creditors to the extent of the value of the security and pro rata with the claims of the other general creditors to the extent that the claim exceeds the value of the security, is affirmed. The judgment is reversed insofar as it holds that the payment of $4900 to Williams on the eve of bankruptcy was not a preferential transfer.
 
 
 30
 Affirmed in part, reversed in part, and remanded.
 
 
 
 Notes:
 
 
 [1]
 At the Trustee's sale, the security actually brought approximately that amount
 
 
 [2]
 See 2 Collier on Bankruptcy (14th Ed.) ¶ 39.28
 
 
 [3]
 The dominance may not have been as great as suggested. He was the chief executive officer and he owned a bare majority of the stock. He and the two Armstrongs were the members of the Board of Directors, and the Armstrongs were able to block, or postpone, salary reductions which Williams sought to effect in May
 
 
 [4]
 In re Madelaine, Inc., 2 Cir., 164 F.2d 419; Monroe v. Scofield, 10 Cir., 135 F.2d 725; Theriot v. Plane, 9 Cir., 126 F.2d 1015; In re Calton Crescent, Inc., S.D. N.Y., 80 F.Supp. 822, aff'd. 2 Cir., 173 F.2d 944, 13 A.L.R.2d 1160, aff'd. 338 U.S. 304, 70 S.Ct. 127, 94 L.Ed. 107; see Stuart v. Larson, 8 Cir., 298 F. 223, 38 A.L.R. 79; 3 Collier on Bankruptcy (14th Ed.) ¶ 63.06
 
 
 [5]
 Richardson's Executor v. Green, 133 U.S. 30, 43, 10 S.Ct. 280, 33 L.Ed. 516
 
 
 [6]
 Cf. Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281
 
 
 [7]
 Cf. International Telephone & Telegraph Corp. v. Holton, 4 Cir., 247 F.2d 178
 
 
 [8]
 In re Madelaine, Inc., 2 Cir., 164 F.2d 419; Barlow v. Budge, 8 Cir., 127 F.2d 440; Theriot v. Plane, 9 Cir., 126 F.2d 1015; Brown v. Freedman, 1 Cir., 125 F.2d 151; In re Sassy Jane Mfg. Co. 9 Cir., 4 F.2d 55; McKey v. Bruns, 7 Cir., 243 F. 370
 
 
 [9]
 Mercantile Trust Co. v. Schlafly, 8 Cir., 299 F. 202