**INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION, Appellant,**

v.

**Frank P. HOLTON, Jr., Trustee in Bankruptcy of Thomasville Furniture Corporation, Bankrupt, Appellee.**

**No. 7417.**

United States Court of Appeals Fourth Circuit.

Argued May 30, 1957.

Decided July 11, 1957.

W. P. Sandridge, Winston Salem, N. C. (Womble, Carlyle, Sandridge & Rice, Winston Salem, N. C., and C. Douglas Webb, New York City, on the brief), for appellant.

Sim A. DeLapp, Lexington, N. C. (Hiram H. Ward and Wade H. Phillips, Lexington, N. C., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and SOBELOFF, Circuit Judges.

PARKER, Chief Judge.

This is an appeal in a bankruptcy case from an order subordinating the claims of the International Telephone & Telegraph Corporation, hereinafter referred to as I. T. & T., to the claims of general creditors of the bankrupt, Thomasville Furniture Corporation. The facts are set forth in detail in the report of the Referee in Bankruptcy approved by the District Judge. Those material to an understanding of the controversy may be stated briefly as follows:

The bankrupt corporation was organized in October 1946 to take over the Thomasville Furniture Company, the stock of which was sold to bankrupt for the sum of $565,000. Shortly after the purchase of this stock, the Thomasville Furniture Company was merged with and its assets were taken over by the bankrupt. Bankrupt was organized with a paid in capital stock of only $1,500, which was less than the cost of its organization, $750 of this stock, called A stock, being owned by the Farnsworth Radio & Television Corporation, hereafter called Farnsworth, which put up the $565,000 to purchase the stock of the Furniture Company and controlled bankrupt through stock ownership and the right which this gave to elect four

of its seven directors.[1] Farnsworth was later taken over by the Capehart-Farnsworth Corporation, hereafter called Capehart, which was still later merged into I. T. & T. As a result of these transfers, I. T. & T. succeeded to all the rights and liabilities of Farnsworth and became charged with notice as to all transactions affecting the relationship between Farnsworth and the bankrupt.

With respect to the relationship existing between bankrupt and Farnsworth and Farnsworth's successors, Capehart and I. T. & T., the evidence supports the finding of the court below that the bankrupt was at all times under their control and operated for their benefit. Farnsworth was in the business of manufacturing and selling television sets and desired to obtain a source from which it could obtain wooden television cabinets. Radio & Television, Inc., hereafter called R. & T., a sales organization discovered that the Furniture Company could be purchased and called the matter to the attention of Farnsworth. That corporation, as heretofore stated, put up the money for the purchase through bankrupt, which was organized for that purpose. R. & T. was allowed to purchase $750 of the B stock of the bankrupt, but Farnsworth held complete control of bankrupt through ownership of the A stock which, as stated, carried with it the right to elect four of the seven directors. Officers or employees of Farnsworth or its successor corporations were elected to these directorships, and one of the executives of Farnsworth of long service was placed in charge of bankrupt as general manager. The extent of the control thus exercised is well set forth in the following findings of the Referee, which are amply supported by the evidence in the case:

"17. The first few years the cabinets manufactured by the bankrupt were taken by the parent stockholders. After the demand for cabinets began to decrease the bankrupt began selling cabinets on the open market, if and when the same could be sold. From 1949 on, the bankrupt had much difficulty in getting material for manufacturing purposes. Capehart and I. T. & T. would advance substantial sums on orders or guarantee the payment of the material procured for their orders. Under this arrangement many of the material furnishers and creditors of the bankrupt were paid or caused to be paid by I. T. & T. only, however, if the creditors' goods or services were used for the manufacture of I. T. & T.'s order. The stockholders meetings were almost always held in the parent corporation's office, which was either Farnsworth, Capehart or I. T. & T. The Vice-President and General Manager of the bankrupt, Richard Jenkins, came to the plant about six months after the merger of the Thomasville Furniture Company with the bankrupt and remained until he was notified by I. T. & T. officials that he was released at the time of bankruptcy. He had about 25 years of top executive service with Farnsworth. He was never a member of the Board of Directors of the bankrupt. The officials and executives of Farnsworth, Capehart and later, I. T. & T., who were the controlling members of the Board of Directors of the bankrupt, together with the General Counsel of I. T. & T., traveled and spent much time and money on the affairs of the bankrupt. None of these expenses and travel were paid for by the bankrupt."

"28. The bankrupt corporation was at all times a mere instrument of Farnsworth until May 4, 1949, and then an instrument of Capehart until the merger with I. T. & T. in

1. The capital stock of the corporation was increased in 1950 to $50,000, but control was still held by the successors of Farnsworth and no new capital was actually added to the assets of the corporation, the increase in capital stock being issued to the stockholders in satisfaction of indebtedness due them.

1953, and an instrument of I. T. & T. since that date. I. T. & T. and its predecessors had the control of the board of directors of the bankrupt and their four directors were fulltime officers and top executives of I. T. & T. The bankrupt corporation was managed, controlled and regulated at the desires and for the benefit of I. T. & T. and its predecessors, and I. T. & T. is charged with all knowledge, defenses and acts of its predecessors.

"29. The four individuals who controlled, dictated and charted the course of the bankrupt were not serving at arms-length with I. T. & T. and its predecessors. The supplying of the $565,000 as represented by debenture was not a bona fide loan at arms-length and the mortgage to Lincoln National Life Insurance Company was for the sole benefit of I. T. & T. and its predecessors. The first mortgage and the refinanced mortgage were for the best interest of I. T. & T. and its predecessors and not for the best interest of the bankrupt.

"30. I. T. & T. and its predecessors organized the corporation not for financial profit, but to serve the express purpose of furnishing them television cabinets which could not be readily purchased on the open market. No dividends were paid by the bankrupt corporation and no salaries were paid to any of the directors and officers of I. T. & T. and its predecessors. I. T. & T. and its predecessors converted the plant from an apparently profitable bedroom suite manufacturer to the manufacture of television cabinets. The control by I. T. & T. and its predecessors was not beneficial to the bankrupt but was beneficial to I. T. & T. and its predecessors. * * *"

The claims of I. T. & T. asserted in the bankruptcy proceeding arose out of the purchase by bankrupt of the Thomasville Furniture Company. As heretofore stated, that transaction was accomplished by a stock purchase at the price of $565,000. Farnsworth put up the money for the purchase, taking a debenture of the bankrupt in that amount. Later a mortgage loan, guaranteed by Farnsworth, was obtained by bankrupt from an insurance company for the sum of $200,000, and the proceeds paid over to Farnsworth in reduction of the amount due on the debenture. This mortgage was reduced by payments made by bankrupt to $132,757.84 by April 1950, when it was raised back to $200,000 and guaranteed by the Capehart-Farnsworth Corporation, which had not then been merged into I. T. & T. Afterwards it was reduced through payments made by the bankrupt to $83,729.56. When the bankrupt failed to make further payments I. T. & T. was called upon to take up and did take up and have assigned to itself the note and mortgage under the guaranty made by Farnsworth, which I. T. & T. had assumed. Through certain payments, not here material, the amount of this note and mortgage has been reduced to $76,235.25 principal and $4,122.99 accrued interest; and claim is asserted by I. T. & T. as a secured claim for that amount. I. T. & T. asserts as a general claim the amount remaining due on the debenture, which is approximately $335,000.

When it became necessary for the bankrupt at one stage of its operations to secure a loan of $100,000 from a bank, I. T. & T. entered into an agreement subordinating the debenture to the note given for the loan. On the eve of bankruptcy, when bankrupt was attempting to sell its plant and property, a proposal was made to creditors that I. T. & T. would subordinate its debenture to their claims if they would stand by and not institute legal action. They stood by and refrained from action for five months but sale was not made and the evidence warrants the inference that this was largely because the official of I. T. & T., who had charge of the matter, was insisting upon too high a price in an effort to salvage as much as possible

of the investment which had been made by itself and its predecessor corporations in the business of the bankrupt.

The holding of the Referee, approved by the Judge below, was that it would be inequitable for the I. T. & T. to be paid the amount of the mortgage as a secured claim, having a lien upon the assets of the bankrupt, or to prove its debenture as a claim on a parity with the claims of other creditors, and that the ordinary rules of equity required the subordination of the mortgage indebtedness as well as the debenture to their claims. If this is done, the other creditors will be paid in full. They will receive 50% on their claims if only the debenture and not the mortgage is subordinated. They will receive only 13% if neither is subordinated. We agree with the Referee and the Judge below that both should be subordinated.

■ There can be no question but that Farnsworth, the predecessor in interest of I. T. & T. in whose shoes I. T. & T. stands, put up the money for the purchase of the business of a half million dollar corporation by the bankrupt, which it organized and controlled for the purpose of acquiring and carrying on that business, or that it launched bankrupt with an entirely inadequate capitalization, taking a debenture for the money which it thus put into the business. In other words, there can be no question but that, through the device of organizing the bankrupt with an entirely inadequate capitalization, Farnsworth substituted an indebtedness to itself for the capital stock of the corporation which was taken over, and started the new corporation out with an indebtedness which rendered it insolvent, in the bankruptcy sense, from the very beginning, and incapable of operation except with the assistance of Farnsworth. There can be no question, furthermore, upon the facts found by the Referee and supported by the evidence, but that Farnsworth and its successors in interest completely controlled the bankrupt and operated it for their own benefit. It would be a reproach to bankruptcy administration if they were allowed to assert as against the claims of other creditors either the debenture or the mortgage, both of which represent, not money really loaned to the bankrupt, but money invested by a parent corporation in the business of a subsidiary which it controlled as an instrumentality of its business. The rule applicable was thus stated in Wheeling Valley Coal Corporation v. Mead, 4 Cir., 171 F.2d 916, 921, where Judge Dobie, speaking for this Court, said:

"While, admittedly, a bankruptcy court has no power to create priorities in addition to those granted by specific statutory provisions, Bankruptcy Act, § 64, 11 U.S.C.A. § 104, Southern Bell Tel. & Tel. Co. v. Caldwell, 8 Cir., 67 F.2d 802, it has been repeatedly held that a bankruptcy court has power to postpone the claims of creditors who have been guilty of conduct which, under the ordinary rules of equity, would make it inequitable for them to share equally with other creditors in the distribution of dividends. Sampsell v. Imperial Paper & Color Corp., 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293, rehearing denied 313 U.S. 600, 61 S.Ct. 1107, 85 L.Ed. 1552; Bird & Sons Sales Corp. v. Tobin, 8 Cir., 78 F.2d 371, 100 A. L.R. 654; In re Bowman Hardware & Electric Co., 7 Cir., 67 F.2d 792; In re Handy-Andy Community Stores, D.C., 2 F.Supp. 97; 100 A. L.R. 660."

The reason underlying the rule was well stated by Judge Learned Hand in his concurring opinion in In re V. Loewer's Gambrinus Brewery Co., 2 Cir., 167 F.2d 318, 320 as follows:

"Both the shareholders and the creditors in any enterprise assume some risk of its failure, but their risks are different. The shareholders stand to lose first, but in return they have all the winnings above the creditors' interest, if the venture is successful; on the other hand the creditors have only their

ınterest, but they come first in distribution of the assets. Beneficially considered, the same persons are both creditors and shareholders, when they have organized into two corporations under a single control. If in such a case they are allowed to prove in insolvency on a parity with other creditors, as shareholders of the debtor they can use their control to take all the winnings which may be made on their advances while the company is successful, yet they will expose themselves only to creditors' risks, if it fails. That is unfair to other creditors regardless of whether they know that the shareholders of the debtor corporation have this power through their common ownership; for every creditor rightly assumes that his risk is measured by the collective claims of other creditors, and by creditors he understands those alone, who like him, have only a stipulated share in the profits. To compel him to divide the assets in insolvency with those who at their option have all along had power to take all the earnings, is to add to the risk which he accepted."

■ Mere domination of a subsidiary corporation by a parent does not require the subordination of claims by the parent where the subsidiary is properly financed and managed. Comstock v. Group of Institutional Investors, 335 U.S. 211, 68 S.Ct. 1454, 92 L.Ed. 1911. Where the subsidiary, however, is controlled by the parent for its own purposes and without regard to the interest of the subsidiary, the claims of the parent should be subordinated, and this without proof of fraud or illegality. A case very much in point is Gannett Co. v. Larry, 2 Cir., 221 F.2d 269, 275, where, as here, a subsidiary corporation had been acquired and controlled by the parent in the interest of the latter. In affirming the subordination of the claim of the parent in the bankruptcy proceeding of the subsidiary, Judge Frank used language which is appropriate here. Said he:

"At the date of the acquisition of Berwin by Gannett, Berwin was in a position to pay all of its creditors, and is now no longer able to do so. Gannett argues that although, in retrospect, mistakes of management were made, they were business errors made in good faith. Assuming this to be true, the fact remains that the losses suffered by Berwin were suffered, not in an attempt by Gannett primarily to make the subsidiary a financially profitable proposition, but to turn it into a source of newsprint, of no interest to the other creditors—unless financially profitable—but of distinct interest to Gannett, whether or not financially profitable, because of Gannett's newsprint shortage. It is because of this factor, totally absent in the Comstock case, that, in the words of Judge Burke, 'It would be unfair to allow the claim of Gannett on a parity with other creditors who lacked the interest which Gannett had in Berwin's disastrous experiment in the newsprint field.' In such circumstances, proof of fraud or illegality is not necessary."

See also Collier on Bankruptcy, 14th ed., vol. 3, sec, 63.06; Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 322, 59 S.Ct. 543, 83 L.Ed. 669; Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281; Stone v. Eacho, 4 Cir., 127 F.2d 284, 288. In the case last cited, this Court said:

"It is too well settled to admit of argument that the claims of a parent corporation against a subsidiary should be thus postponed where the subsidiary, as here, has in reality no separate existence, is not adequately capitalized and constitutes a mere instrumentality of the parent corporation or a mere 'corporate pocket' or department of its business. See Sampsell v. Imperial Paper & Color Corporation, 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293; Pepper v. Litton, 308 U.S. 295, 60

S.Ct. 238, 84 L.Ed. 281; Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 618, 59 S.Ct. 543, 83 L. Ed. 669; Forbush Co. v. Bartley, 10 Cir., 78 F.2d 805; New York Trust Co. v. Island Oil & Transport Corporation, 2 Cir., 56 F.2d 580; Baker Motor Vehicle Co. v. Hunter, 2 Cir., 238 F. 894; In re Watertown Paper Co., 2 Cir., 169 F. 252; 19 C.J.S. Corporations § 1568, p. 1311; Powell, Parent and Subsidiary Corporations 112–115; Latty, Subsidiaries and Affiliated Corporations, ch. VI, pp. 153, 155; note 54 Harvard Law Review p. 1045 et seq. * * * It is well settled that courts will not be blinded by corporate forms nor permit them to be used to defeat public convenience, justify wrong or perpetrate fraud, but will look through the forms and behind the corporate entities involved to deal with the situation as justice may require."

The case at bar cannot be brought from under this rule by reason of the fact that R. & T. owned $750 stock in the corporation and had the right to elect a minority of the directors and certain contract rights with respect to the purchase of television cabinets. These represented recognition of the part which R. & T. had played in discovering the furniture company which Farnsworth purchased but did not impart any element of independence to the business which was purchased, paid for and controlled by Farnsworth.

What we have here is, not merely the domination of the subsidiary by the parent corporation for the interest of the latter, but in addition the fact that the claim arises out of what purports to be a loan to the subsidiary but is not a loan in any true sense at all, but the use of the subsidiary by the parent to purchase with the parent's money a business for the parent's benefit. Through the use of the subsidiary for this purpose, Farnsworth attempted to give itself the status of a creditor for the entire amount of its investment in the business, in-

stead of the status of owner or stockholder, but the realities of the situation cannot be ignored. The Thomasville Furniture Company at the time of the purchase was a going concern, adequately capitalized, owing very little and with net assets of $565,000. As a result of what was done, that company was merged into bankrupt, and the corporations as merged had a capitalization of only $1,500 and owed to Farnsworth an indebtedness of $565,000. When the subsidiary is thus launched by the parent with an entirely inadequate capitalization and with congenital insolvency, it would be highly inequitable to allow the parent to share with creditors of the subsidiary in its assets on the basis of an indebtedness, which represents in reality nothing but its investment of risk capital.

No better case can be made for the mortgage indebtedness; for this represents a lien placed on the assets of the subsidiary to raise money to pay on the indenture held by the parent, which guaranteed payment of the mortgage that it might receive the payment. The mortgage of assets was for the benefit of Farnsworth, not the bankrupt, and can no more be sustained than a mortgage on corporate assets given a controlling stockholder for the purchase and retirement of his stock. Cf. Jarroll Coal Co. v. Lewis, 4 Cir., 210 F.2d 578, 47 A.L.R.2d 753. And it makes no difference that after the mortgage had been paid down to approximately $133,000, it was renewed and that the corporation received approximately $67,000 upon the renewal. The amount thus received was more than paid back after the renewal and the balance of $83,000 remaining due was less than the amount due on the original obligation at the time of the renewal. We know of no principle of equity upon which this balance due on the indebtedness created for the benefit of the parent corporation could be purged of its infirmity to the prejudice of general creditors of the bankrupt subsidiary.

Affirmed.