In the Matter of Hannibal Napoleon
SIMPSON and Doris Dean
Simpson, Bankrupts.
Nos. 34–62, 35–62.

United States District Court
M. D. North Carolina,
Greensboro Division.

Nov. 1, 1963.

Jordan, Wright, Henson & Nichols, Greensboro, N. C., for Guilford Mortgage Co., Sidney B. Allen, trustee, and David W. Allen, trustee, petitioners.

William Zuckerman, Eugene G. Shaw, Hubert E. Seymour, Jr., W. Marcus Short, Richard J. Tuggle and Jack W. Floyd, Greensboro, N. C., and John E. Hall, North Wilkesboro, N. C., for respondents.

EDWIN M. STANLEY, Chief Judge.

This matter is before the court upon the petition of Guilford Mortgage Company, Sidney B. Allen, Trustee, and David W. Allen, Trustee, for review of an order of the Referee in Bankruptcy, dated February 7, 1963, subordinating secured claims of Guilford Mortgage Company to the claims of certain material furnishers and to liquidation costs.

The bankrupts, who are husband and wife, filed voluntary petitions for bankruptcy on July 20, 1963. Hannibal Napoleon Simpson, hereinafter referred to as the bankrupt, was in the contracting business building homes for sale. While most of the real estate involved was conveyed to the bankrupt and his wife, Doris Dean Simpson, they were not partners in the construction business, and the wife had no financial interest in any of the real estate or financial transactions. She did, however, execute notes and mortgages at the request of her husband.

Among the assets of the bankrupt were houses at 3019 Cornwallis Drive, 1006 McDowell Road, 4015 Adamson Road, and 2504 Pinecroft Road, all in or near the City of Greensboro. Pursuant to an order of court, these houses were sold by the Trustee in Bankruptcy and all liens were transferred to the proceeds. The proceeding before the Referee was to determine the amount, validity and priority of the liens on the houses in question. With respect to the properties located on Cornwallis Drive, McDowell Road, and Pinecroft Road, the Referee found that the Guilford Mortgage Company and the bankrupt were joint venturers in the construction of these homes, and subordinated the mortgage liens of Guilford Mortgage Company to the claims of certain materialmen and the liquidating costs. There were, however, no unpaid claims for materials on the Pinecroft Road property, and the only outstanding lien on this house was a mortgage in favor of Guilford Mortgage Company. With respect to the Adamson Road property, the Referee found there was no evidence of a joint venture, and consequently the lien of Guilford Mortgage on this

house is not in controversy, except to the extent the sale price was insufficient to pay the liquidating costs and the mortgage, including interest, in full. The Guilford Mortgage Company liens on the properties located on Cornwallis Drive and McDowell Road were subordinated to the liens of materialmen by reason of a finding of joint ventures between the bankrupts and Guilford Mortgage Company, as well as upon the legal theory of subordinating claims. The Trustee contended that not only the material furnishers but all general creditors of the bankrupts should come ahead of the mortgages upon the same ground, but the contention was rejected by the Referee with respect to general creditors.

The facts are set forth in detail in the order of the Referee. Those material to an understanding of the controversy may be summarized as follows.

The bankrupt had been in the general contracting business since about 1945. Most of his work had been in connection with the construction of residences, which were built for sale rather than for the owner. Until sometime in 1958, the bankrupt had been getting his financing through C. H. Slater, but upon Mr. Slater's death, he turned to the Guilford Mortgage Company for his financing.

Guilford Mortgage Company has been in the general real estate and mortgage loan business for more than 30 years. One of its businesses is to make construction loans. A construction loan is a short term loan made for the purpose of making funds available to the builder as construction progresses. When the house is sold by the builder, the permanent loan is obtained by the purchaser and the construction loan paid off. Permanent loans are also made by Guilford Mortgage Company as correspondents or agents for insurance companies. The Guilford Mortgage Company is owned by Sidney B. Allen, his son, David Allen, and other immediate members of his family. Sidney B. Allen is president and owns a majority of the stock of the corporation. He also controls, manages and directs the major activities of the corporation. Only minor

matters are delegated to his son, David Allen, who is the secretary of the corporation.

· Due to his limited resources, the customary procedure of the bankrupt was to obtain a construction loan, from which a lot would be purchased and the balance used to pay the subcontractors and material furnishers in the construction of the house. Upon the sale of the house, permanent financing would be obtained by the purchaser and the construction loan liquidated. Lending institutions in the Greensboro area, such as savings and loan associations, banks, and insurance companies, do not customarily make construction loans for the purpose of purchasing a lot and constructing a house. It was primarily for this reason that the bankrupt turned to the Guilford Mortgage Company for his construction loans.

On July 7, 1958, the bankrupt entered into an agreement with the Guilford Mortgage Company covering the construction of five homes in Pine Hill Village. Under the agreement, the Guilford Mortgage Company was to make a construction loan on each of the five houses. The construction loan on each house was $12,000.00, out of which $2,000.00 was to be paid toward the purchase of the lot. Plans were to be approved by the Guilford Mortgage Company. The houses were to be sold by the Guilford Mortgage Company and, whenever possible, the Guilford Mortgage Company was to have the permanent financing and fire insurance. Guilford Mortgage Company was to also get one-half of the net profits, with a guaranteed profit of $600.00 on each house. As a bonus for making the construction loans, the bankrupt agreed to give the Guilford Mortgage Company a lot in another subdivision which had an estimated value of up to $5,000.00. Houses were built on four of the five lots in accordance with the agreement. By agreement of the parties, the other lot was sold without a building having been erected. Three of the houses were sold and settlement made before the bankruptcy petition was filed. The guaranteed profit of $600.00 was paid on each

of the three houses to Sidney B. Allen, at his direction, even though the contract directed that such payments be made to Guilford Mortgage Company. The fourth house is one of the houses involved in this proceeding, and identified as 2504 Pinecroft Road. This house had not been sold due to the lack of a purchaser. All material furnishers had been paid. In accordance with the contract, Guilford Mortgage Company made the construction loans on each of the four houses, plans were approved by Guilford Mortgage Company, and the insurance was given to the Guilford Mortgage Company. The lot which the bankrupt had agreed to give to the Guilford Mortgage Company as a bonus for making the construction loans was conveyed to a corporation owned by the immediate family of Sidney B. Allen, even though the contract called for it to be conveyed to Guilford Mortgage Company. All the construction loans were repaid, except the one involved in this proceeding. The profits from the houses were divided in the manner provided in the contract.

Subsequent to the construction of the four houses in Pine Hill Village in accordance with the aforementioned contract, the bankrupt contracted to build 25 to 30 other houses, with construction loans made by the Guilford Mortgage Company. Several of the loans were made on the same or similar terms as the Pine Hill Village contract, except the agreements were oral. A similar agreement was entered into between the bankrupt and Guilford Mortgage Company in connection with the construction of a house at 906 Pembroke Road. The Guilford Mortgage Company made the construction loan on the understanding and agreement that the plans were to be approved by the Guilford Mortgage Company, and that Guilford Mortgage Company would get the insurance and sell the house at regular commission rates. The lot was purchased from the proceeds of the construction loan. This agreement was carried out and Sidney B. Allen received a check for $1,000.00 for his share of the profits. Payment was made to Sid-

ney B. Allen rather than Guilford Mortgage Company, at the direction of Sidney B. Allen. The house was sold about July 2, 1959, and the construction loan was paid off by a permanent loan obtained by the purchaser through Guilford Mortgage Company.

Another house was built on the same arrangement on Avery Drive. There was no profit on this house, and nothing was paid to either Guilford Mortgage Company or Sidney B. Allen.

A third house was built at 1324 Surry Drive on the same arrangement, with one-half of the profits going to Guilford Mortgage Company. Sidney B. Allen directed that the profits on this house be paid to his two daughters. There was no evidence that the daughters contributed anything toward the financial investment of this transaction. On the other hand, the Referee found that it was a method of directing funds from Guilford Mortgage Company to the two daughters of Sidney B. Allen for some undisclosed purpose.

The houses on Cornwallis Drive and McDowell Road were built by the bankrupt with construction loan funds furnished by Guilford Mortgage Company. The construction loans were subject to an oral agreement similar to the agreement with respect to the Pine Hill Village houses. Lots were purchased with construction loan funds. The location of the lots and the plans for the houses were approved by Sidney B. Allen. Any profits were to be divided equally between the bankrupt and the Guilford Mortgage Company or Sidney B. Allen. Insurance on both houses was written by the Guilford Mortgage Company, and the company had an exclusive listing for the sale of the houses. The houses were about 95% completed at the time the petition in bankruptcy was filed, but had been on the market for sale for some time in their unfinished condition.

The house on Adamson Road was built with a construction loan from Guilford Mortgage Company under a similar agreement, except there was no agreement with respect to a division of the profits. The Referee held that the construction of this house did not constitute a joint venture, but the circumstances under which the house was constructed lend support to his findings with respect to the other properties involved in this proceeding.

During his dealings with Guilford Mortgage Company, the bankrupt had only one person on his payroll, and that person was a yard or clean-up man who did odd jobs from house to house. All the work on the houses was done by subcontractors and material furnishers. The bankrupt had no office, and his only assistance came from his wife, who kept records in their home. The bankrupt was in constant financial difficulties during the entire time he was dealing with Guilford Mortgage Company, and this fact was known by Sidney B. Allen. The bankrupt contended that in all instances where profits were to be shared with Guilford Mortgage Company, the company was to also share in the losses. However, the bankrupt stated he was never in a financial condition to assert this right because of his fear of being cut off from further financial aid from Guilford Mortgage Company.

The construction money on each of the houses was advanced and paid to the bankrupt from time to time as he requested the funds, and as construction developed on the houses. Only in one instance was a check made payable jointly to a material furnisher and the bankrupt. No other material furnisher presented any bill directly to Guilford Mortgage Company before the bankruptcy. Neither Guilford Mortgage Company nor any of its officers ever requested a list of material furnishers, or the names of subcontractors. Generally, however, the Guilford Mortgage Company knew who was doing the subcontracting and furnishing the materials. Sidney B. Allen frequently reminded the bankrupt to keep the subcontractors paid, but never made any effort to find out if any of them had actually been paid or whether any arrangement had been made or was being made to satisfy them.

The bankrupt had only one checking account, which was used for his personal affairs as well as his construction business. Advancements made on construction loans by Guilford Mortgage Company were put into this one checking account, and from these funds the bankrupt paid any bills and accounts which he desired. No effort was made by the bankrupt to apply all the advancements on a particular construction, or to accounts for that particular house. When a house was sold, the bankrupt most frequently had to raise funds from other sources to pay off the remaining accounts on the house. The advancements from the construction loans on the Cornwallis Drive and McDowell Road houses were not applied to the payment of material and subcontractors on these houses, and such funds were partially, if not totally, diverted to other obligations of the bankrupt. This procedure of expenditures of funds from construction loans was known, or should have been known, by Sidney B. Allen and the Guilford Mortgage Company.

The bankrupt, while constructing the houses in question, went by Guilford Mortgage Company office two or three times a week. Sidney B. Allen called on the bankrupt at his home two or three times per week at night to discuss the progress of the houses, and often gave directions to the bankrupt's one hired man as to how the premises should be cleaned, looked after and finished. Sidney B. Allen also supervised, controlled and dominated the bankrupt in the construction of each of the homes in question, as well as other houses upon which the Guilford Mortgage Company had made construction loans.

■■ Under the foregoing facts, the Referee found that the construction of the houses on Cornwallis Drive, McDowell Road and Pinecroft Road were joint ventures between Guilford Mortgage Company and the bankrupt, and that the liens of Guilford Mortgage Company should be subordinated to the liens of materialmen with respect to the Cornwallis Drive and McDowell Road properties. The Referee also found that the expenses of preserv-

ing and liquidating the four properties should be paid before the liens of the Guilford Mortgage Company. In reviewing the findings of fact of the Referee, this court is bound by the clearly erroneous rule. Rule 53(e) (II), Federal Rules of Civil Procedure; General Order in Bankruptcy 47, 11 U.S.C.A. following Section 53; Mountain Trust Bank v. Shifflett, 4 Cir., 255 F.2d 718 (1958); Austin v. National Discount Corporation, 4 Cir., 322 F.2d 928 (1963). After a thorough review of the evidence before the Referee, including the exhibits, the court is convinced that the facts found by the Referee are based on substantial evidence and are not clearly erroneous.

■ The Referee first concluded that the liens of Guilford Mortgage Company should be subordinated to the liens of the materialmen under the equity powers of the Bankruptcy Court to subordinate claims. There can be no question but that the ordinary rules of equity permit the subordination of a mortgage indebtedness to other claims where equity and fairness dictate that such claims should first be paid. International Telephone and Tel. Corp. v. Holton, 4 Cir., 247 F.2d 178 (1957); Collier on Bankruptcy, Volume 3, § 57.14, § 63.08 and § 65.05. The Guilford Mortgage Company knew that the bankrupt was using proceeds from the construction loans to purchase lots in addition to the construction of the houses, and that the loans would be inadequate to pay the subcontractors and materialmen. It was also known that the bankrupt was in constant financial difficulty since he was unable to purchase lots out of his own resources. The corporation, acting through its president, Sidney B. Allen, should have known there was a likelihood that the material furnishers would not be paid out of the construction loan advancements for a particular house, since the lot was also being purchased from the proceeds of the loan. Under these circumstances, and the close relationship between the petitioners and the bankrupt, it would be wholly unfair and unjust for the Guilford Mortgage Company to recover its entire

advancements on these houses, thereby excluding the firms and individuals who furnished the materials for their construction. Simple justice and equity demand that the liens of Guilford Mortgage Company be subordinated to these claims.

The Referee also found that the Guilford Mortgage Company and the bankrupt were joint venturers with respect to the construction of the homes on Cornwallis Drive, McDowell Road and Pinecroft Road, and for this additional reason concluded that the unpaid claims for materials furnished in the construction of the Cornwallis Drive and McDowell Road properties should be paid ahead of the claim of Guilford Mortgage Company. Upon a review of the record as a whole, it cannot be said that the Referee was not justified in making this finding. Admittedly, there are conflicts in the evidence bearing upon this point, but it was the function and duty of the Referee, not this court, to resolve the conflicts and determine the facts necessary for decision.

"A joint venture is an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, but without creating a partnership in the legal or technical sense of the term. * * *" 30 Am. Jur., Joint Adventures § 2, p. 939.

"Facts showing the joining of funds, property, or labor, in a common purpose to attain a result for the benefit of the parties in which each has a right in some measure to direct the conduct of the other through a necessary fiduciary relation, will justify a finding that a joint adventure exists." 30 Am. Jur., Joint Adventures § 6, p. 943.

"The existence of a joint adventure may be inferred from the conduct of the parties or from facts and circumstances which make it appear that a joint enterprise was in fact entered into, as by proof of active participation in the enterprise, or some control over the subject matter thereof or property engaged therein." 30 Am.Jur., Joint Adventures § 7, p. 944.

"To constitute a joint adventure, the parties must combine their property, money, efforts, skill, or knowledge in some common undertaking. The contributions of the respective parties need not be equal or of the same character, but there must be some contribution by each coadventurer of something promotive of the enterprise." 30 Am.Jur., Joint Adventures § 9, p. 945.

The authorities are divided as to whether the sharing of losses is essential to the creation of a joint venture, and it is sometimes held that, in the absence of such an agreement, the law supplies the provision that losses are to be shared in the same proportion as the profits.

"Even though a sharing of the losses may be necessary to constitute the particular transaction a joint adventure, the term 'loss' does not necessarily mean actual monetary loss. The requirement is satisfied if one party's time and the monetary investment of the other parties would have been for nought. Accordingly, there is authority for the proposition that an agreement, express or implied, to share losses is not essential to a joint adventure in cases where one party furnishes money and the other services." 30 Am.Jur., Joint Adventures § 11, p. 947.

"A corporation may * * * enter into a joint adventure with individuals where the nature of the enterprise is within the scope of its legitimate powers." 13 Am.Jur., Corporations § 825, p. 831.

For a comprehensive discussion of the essential elements of a joint venture, see Backus Plywood Corporation v. Commercial Decal, Inc., 208 F.Supp. 687 (D.C., S.D.N.Y., 1962).

There can be no question but that the Guilford Mortgage Company and the

bankrupt were joint venturers with respect to the construction of the homes in Pine Hill Village. The written contract provided every essential element of a joint venture. The Referee found, as he was justified from all the evidence, that the homes on Cornwallis Drive and McDowell Road were constructed under similar, but oral, agreements. The Pinecroft Road house is, of course, one of the houses referred to in the written agreement. The Referee was also justified in finding that Sidney B. Allen was acting for and on behalf of Guilford Mortgage Company in making the oral agreements with respect to the construction of the homes on Cornwallis Drive and McDowell Road. The petitioners do not contest the fact that if the Guilford Mortgage Company and the bankrupt were joint venturers with respect to the construction of these homes, the materialmen are entitled to be paid before the lien of Guilford Mortgage Company is paid.

The final question for decision is whether the Referee was justified in ordering the payment of the expenses of preserving and liquidating the four properties before applying the purchase price to the payment of the Guilford Mortgage Company liens. The liens of the Guilford Mortgage Company on the four properties involved were secured by the following instruments:

(a) *3019 Cornwallis Drive*: A deed of trust from the bankrupt to David W. Allen, Trustee, securing an indebtedness to Guilford Mortgage Company in the amount of $20,000.00.

(b) *1006 McDowell Road*: A deed of trust from the bankrupt to Sidney B. Allen, Trustee, securing an indebtedness to Guilford Mortgage Company in the amount of $20,000.00.

(c) *2504 Pinecroft Road*: A deed of trust from the bankrupt to Sidney B. Allen, Trustee, securing an indebtedness to Guilford Mortgage Company in the amount of $12,000.00.

(d) *4015 Adamson Drive*: A deed of trust from the bankrupt to Sidney B. Allen, Trustee, securing an indebtedness to Guilford Mortgage Company in the amount of $11,500.00.

In each instance, the property was sold by the Trustee and the liens transferred to the proceeds. The Referee held that the expenses of preserving and liquidating the property should first be paid. This expense included revenue stamps, advertising costs, auctioneer's fee, a Trustee's fee in the amount of 1% of the sales price, a fee to the attorney for the Trustee in the amount of 1% of the sales price, and Referee's salary and expense fund of 2% of the sales price.

■■ With respect to the Pinecroft Road property, where all subcontractors and materialmen had been paid before the bankruptcy, and the Adamson Road property, where the Referee found insufficient evidence to establish a joint venture, the court can see no justification for ordering the payment of a fee to the Trustee and his attorney, or a contribution to the Referee's salary and expense fund, before liquidating the Guilford Mortgage Company liens. Admittedly, the Guilford Mortgage Company had first liens on these properties. Since it has been found that Sidney B. Allen and Guilford Mortgage Company were one and the same in their dealings with the bankrupt, it necessarily follows that any fee to the Trustee in foreclosing these liens would accrue to the benefit of Guilford Mortgage Company. Ordinarily, a lienholder is not to be divested of his rights in a security by the allowance of commissions and other expenses, where the services have no relation to the security. Textile Banking Company v. Widener, 4 Cir., 265 F.2d 446 (1959). Either Sidney B. Allen or Guilford Mortgage Company would necessarily have been responsible for the payment of the costs of the revenue stamps, the advertising costs, and auctioneer's fee. Since these costs would have been chargeable to the petitioners had the property not been sold by the Trustee in bankruptcy, they should first

be paid out of the funds realized from the sale of the houses.

With respect to the Cornwallis Drive and McDowell Road properties, the Referee was justified in ordering the payment of the entire cost of preserving and liquidating the properties before the payment of the Guilford Mortgage Company liens. Since there were other liens to be paid prior to the liens of the Guilford Mortgage Company, it was only proper that the Trustee in bankruptcy should have been ordered to liquidate these properties and be compensated for his trouble. In no instance did the expense of preserving and liquidating the properties exceed the 5% provided in the deeds of trust for foreclosure.

It is concluded that the order of the Referee should in all respects be affirmed, except that the proceeds from the sale of the Adamson Road and Pinecroft Road property should not be charged with a fee to the Trustee and his attorney, or a contribution to the Referee's salary and expense fund, before liquidating the liens of Guilford Mortgage Company, including accrued interest.

An order will be entered accordingly.