John COSTELLO, Trustee in Bankruptcy of Leonard Plumbing and Heating Supply, Inc., Bankrupt, Appellant,

v.

J. A. FAZIO and Lawrence C. Ambrose, Appellees.

No. 15587.

United States Court of Appeals Ninth Circuit.

May 28, 1958.

Francis P. Walsh, Henry Gross, James M. Conners, Stuart R. Dole, San Francisco, Cal., for appellant.

Shapro & Rothschild, San Francisco, Cal., for appellees.

Before HEALY, FEE and HAMLEY, Circuit Judges.

HAMLEY, Circuit Judge.

Creditors' claims against the bankrupt estate of Leonard Plumbing and Heating Supply, Inc., were filed by J. A. Fazio and Lawrence C. Ambrose. The trustee in bankruptcy objected to these claims, and moved for an order subordinating them to the claims of general unsecured creditors. The referee in bankruptcy denied the motion, and his action was sustained by the district court. The trustee appeals.

The following facts are not in dispute: A partnership known as "Leonard Plumbing and Heating Supply Co." was organized in October, 1948. The three partners, Fazio, Ambrose, and B. T. Leonard, made initial capital contributions to the business aggregating $44,806.40. The capital contributions of the three partners, as they were recorded on the company books in September 1952, totaled $51,620.78, distributed as follows: Fazio, $43,169.61; Ambrose, $6,451.17; and Leonard, $2,000.

In the fall of that year, it was decided to incorporate the business. In contemplation of this step, Fazio and Ambrose, on September 15, 1952, withdrew all but $2,000 apiece of their capital contributions to the business. This was accomplished by the issuance to them, on that date, of partnership promissory notes in the sum of $41,169.61 and $4,451.17, respectively. These were demand notes, no interest being specified. The capital contribution to the partnership business then stood at $6,000—$2,000 for each partner.

The closing balance sheet of the parnership showed current assets to be $160,791.87, and current liabilities at $162,162.22. There were also fixed assets in the sum of $6,482.90, and other assets in the sum of $887.45. The partnership had cash on hand in the sum of $66.66, and an overdraft at the bank in the amount of $3,422.78.

Of the current assets, $41,357.76, representing "Accounts receivable—Trade," was assigned to American Trust Co., to secure $50,000 of its $59,000 in notes payable. Both before and after the incorporation, the business had a $75,000 line of credit with American Trust Co., secured by accounts receivable and the personal guaranty of the three partners and stockholders, and their marital communities.

The net sales of the partnership during its last year of operations were $389,543.72, as compared to net sales of $665,747.55 in the preceding year. A net loss of $22,521.34 was experienced during this last year, as compared to a net profit of $40,935.12 in the year ending September 30, 1951.

Based on the reduced capitalization of the partnership, the corporation was capitalized for six hundred shares of no par value common stock valued at ten dollars per share. Two hundred shares were issued to each of the three partners in consideration of the transfer to the corporation of their interests in the partnership. Fazio became president, and Ambrose, secretary-treasurer of the new corporation. Both were directors. The corporation assumed all liabilities of the partnership, including the notes to Fazio and Ambrose.

In June 1954, after suffering continued losses, the corporation made an assignment to the San Francisco Board of Trade for the benefit of creditors. On October 8, 1954, it filed a voluntary petition in bankruptcy. At this time, the

corporation was not indebted to any creditors whose obligations were incurred by the pre-existing partnership, saving the promissory notes issued to Fazio and Ambrose.

Fazio filed a claim against the estate in the sum of $34,147.55, based on the promissory note given to him when the capital of the partnership was reduced. Ambrose filed a similar claim in the sum of $7,871.17. The discrepancy between these amounts and the amounts of the promissory notes is due to certain setoffs and transfers not here in issue.

In asking that these claims be subordinated to the claims of general unsecured creditors, the trustee averred that the amounts in question represent a portion of the capital investment in the partnership. It was alleged that the transfer of this sum from the partnership capital account to an account entitled "Loans from Copartners," effectuated a scheme and plan to place copartners in the same class as unsecured creditors. The trustee further alleged, with respect to each claimant:

"* * * If said claimant is permitted to share in the assets of said bankrupt now in the hands of the trustee, in the same parity with general unsecured creditors, he will receive a portion of the capital invested which should be used to satisfy the claims of creditors before any capital investment can be returned to the owners and stockholders of said bankrupt."

A hearing was held before the referee in bankruptcy. In addition to eliciting the above recounted facts, three expert witnesses called by the trustee, and one expert witness called by the claimants, expressed opinions on various phases of the transaction.

Clifford V. Heimbucher, a certified public accountant and management consultant, called by the trustee, expressed the view that, at the time of incorporation, capitalization was inadequate. He further stated that, in incorporating a business already in existence, where the approximate amount of permanent capital needed has been established by experience, normal procedure called for continuing such capital in the form of common or preferred stock.

Stating that only additional capital needed temporarily is normally set up as loans, Heimbucher testified that "* * * the amount of capital employed in the business was at all times substantially more than the $6,000 employed in the opening of the corporation." He also expressed the opinion that, at the time of incorporation, there was "very little hope [of financial success] in view of the fact that for the year immediately preceding the opening of the corporation, losses were running a little less than $2,000 a month. * * *"

William B. Logan, a business analyst and consultant called by the trustee, expressed the view that $6,000 was inadequate capitalization for this company.[1] John S. Curran, a business analyst, also called by the trustee, expressed the view that the corporation needed at least as much capital as the partnership required prior to the reduction of capital.

Robert H. Laborde, Jr., a certified public accountant, had handled the accounting problems of the partnership and corporation. He was called by the trustee as an adverse witness, pursuant to § 21, sub. j of the Bankruptcy Act, 11 U.S.C.A. § 44, sub. j. Laborde readily conceded that the transaction whereby Fazio and Ambrose obtained promissory notes from the partnership

1. He testified:
"A. * * * In 1952, that same year, of about 124 companies in this particular line, the average ratio of turnover of net worth of capital to sales ranged between three and five times. On this basis here, on $6,000, with a sales of approximately $400,000, it would have better than 60, 65-time turnover which certainly is quite a contrast from a three to five-time turnover. Q. Is a sixty-times turnover feasible at all? A. Impossible strictly from the capitalization standpoint. * * *"

was for the purpose of transferring a capital account into a loan or debt account. He stated that this was done in contemplation of the formation of the corporation, and with knowledge that the partnership was losing money.

The prime reason for incorporating the business, according to Laborde, was to protect the personal interest of Fazio, who had made the greatest capital contribution to the business. In this connection, it was pointed out that the "liabilities on the business as a partnership were pretty heavy." There was apparently also a tax angle. Laborde testified that it was contemplated that the notes would be paid out of the profits of the business. He agreed that, if promissory notes had not been issued, the profits would have been distributed only as dividends, and that as such they would have been taxable.

Claimants, in their brief, say that Laborde "testified that in his opinion the bankrupt corporation was adequately capitalized at the inception of its corporate existence for several reasons. * * * * " We find no support in the record for this statement, and claimants have cited none.[2]

Laborde did express the opinion that the corporation had adequate working capital at the time of incorporation. This was disputed by Heimbucher and Curran. They called attention to the fact that the corporate books showed that current liabilities exceeded current assets at that time, and that there was thus a minus working capital on the opening day of business of the corporation.[3]

In any event, when we speak of inadequacy of capital in regard to whether loans to shareholders shall be subordinated to claims of general creditors, we are not referring to working capital. We are referring to the amount of the investment of the shareholders in the corporation. This capital is usually referred to as legal capital, or stated capital in reference to restrictions on the declaration of dividends to stockholders.[4]

2. Laborde was asked to state what "opinion" he gave the incorporators and whether he still entertained it. This question was not specifically referenced to adequacy of capital, and the answer given does not reveal the witness' opinion on that subject. The following question was then asked and answered: "Q. And did you express an opinion as to whether or not the stated capital of $6,000.00, having in mind the execution of corporate notes for the remainder of what had been the capital accounts of the partners, would with the other assets of the business be sufficient in your opinion for the corporation to carry on successfully? A. Yes." The witness was not thereafter asked to state what the opinion was that he had expressed, or what was his present opinion on the subject.

3. Current liabilities then exceeded current assets by $1,370.35. Laborde's opinion that there was adequate working capital was apparently based upon the fact that the corporation had a $75,000 line of credit with American Trust Company. Where repayment of loans made under such a line of credit is to be extended over a long term, the result may be to increase working capital. This is because current assets are then offset, not by current liabilities, but by fixed liabilities. But here the loans made under this line of credit were secured by accounts receivable. Where this is the case, the obligations to repay are uniformly classified as current, rather than fixed, liabilities. They were so classified in this case, and in fact the balance sheet of October 1, 1952, lists no fixed liabilities.

Working capital is the excess of current assets over current liabilities. Since the loans made under this line of credit increased current assets and current liabilities in equal amounts, the net change in working capital was nil. Heimbucker's testimony to this effect is undisputed, and is in accord with recognized principles of accounting. See "Accounting and the Law," Dohr-Thompson-Warren, 2d Ed., The Foundation Press, Inc., 1955, pages 25, 259–263.

4. Capital in the sense of legal or stated capital measures the amount of the margin of assets over debts and liabilities required to be retained as a condition of granting the shareholders the privilege of trading in a corporate capacity with limited liability. 23 Cal.L.Rev. 229, "Corporate Capital and Restrictions upon Dividends under Modern Corporation Laws," Ballantine and Hills.

As before stated, Laborde expressed no opinion as to the adequacy of proprietary capital put at the risk of the business. On the other hand, the corporate accounts and the undisputed testimony of three accounting experts demonstrate that stated capital was wholly inadequate.

On the evidence produced at this hearing, as summarized above, the referee found that the paid-in stated capital of the corporation at the time of its incorporation was adequate for the continued operation of the business. He found that while Fazio and Ambrose controlled and dominated the corporation and its affairs they did not mismanage the business. He further found that claimants did not practice any fraud or deception, and did not act for their own personal or private benefit and to the detriment of the corporation or its stockholders and creditors. The referee also found that the transaction which had been described was not a part of any scheme or plan to place the claimants in the same class as unsecured creditors of the partnership.

On the basis of these findings, the referee concluded that, in procuring the promissory notes, the claimants acted in all respects in good faith and took no unfair advantage of the corporation, or of its stockholders or creditors.

Pursuant to § 39, sub. c of the Bankruptcy Act, 11 U.S.C.A. § 67 sub. c, the trustee filed a petition for review of the referee's order. The district court, after examining the record certified to it by the referee, entered an order affirming the order of the referee.[5]

On this appeal, the trustee advances two grounds for reversal of the district court order. The first of these is that claims of controlling shareholders will be deferred or subordinated to outside creditors where a corporation in bankruptcy has not been adequately or honestly capitalized, or has been managed to the prejudice of creditors, or where to do otherwise would be unfair to creditors.

As a basis for applying this asserted rule in the case before us, the trustee challenges most of the findings of fact noted above.

▮ The district court and this court are required to accept the findings of the referee in bankruptcy, unless such findings are clearly erroneous.[6]

▮ Where a finding of fact by the referee is based upon conflicting evidence, or where the credibility of witnesses is a factor, a district court and, on appeal, a court of appeals will seldom hold such a finding clearly erroneous. The same reluctance is not encountered with regard to a factual conclusion from given facts. In the latter case, the proper conclusion from given facts can be made by the trial judge, or the court of appeals, as well as the referee.[7]

The factual conclusion of the referee, that the paid-in capital of the corporation at the time of its incorporation was adequate for the continued operation of the business, was based upon certain accounting data and the expert testimony of four witnesses. The accounting data, summarized above, is contained in the opening balance sheet and the comparative profit and loss statements of the corporation, and is not in dispute.

It does not require the confirmatory opinion of experts to determine from this data that the corporation was grossly undercapitalized. In the year immediately preceding incorporation, net

5. The district court order reads: "There is substantial evidence in the record to sustain the findings of the Referee. His order overruling the Trustee's objections to the proofs of the claims of J. A. Fazio and L. C. Ambrose is therefore affirmed."

6. General Order in Bankruptcy No. 47, 11 U.S.C.A. following section 53; Rules 52 (a) and 53(e), Federal Rules of Civil Procedure, 28 U.S.C.A.; Lines v. Falstaff Brewing Co., 9 Cir., 233 F.2d 927, 930.

7. In re Morasco, 2 Cir., 233 F.2d 11, 15; Sheldon v. Waters, 5 Cir., 168 F.2d 483, 485.

sales aggregated $390,000. In order to handle such a turnover, the partners apparently found that capital in excess of $50,000 was necessary. They actually had $51,620.78 in the business at that time. Even then, the business was only "two jumps ahead of the wolf."[8] A net loss of $22,000 was sustained in that year; there was only $66.66 in the bank; and there was an overdraft of $3,422.78.

Yet, despite this precarious financial condition, Fazio and Ambrose withdrew $45,620.78 of the partnership capital—more than eighty-eight per cent of the total capital. The $6,000 capital left in the business was only one-sixty-fifth of the last annual net sales. All this is revealed by the books of the company.

But if there is need to confirm this conclusion that the corporation was gross undercapitalized, such confirmation is provided by three of the four experts who testified. The fourth expert, called by appellees, did not express an opinion to the contrary.

■ We therefore hold that the factual conclusion of the referee, that the corporation was adequately capitalized at the time of its organization, is clearly erroneous.

The factual conclusion of the trial court, that the claimants, in withdrawing capital from the partnership in contemplation of incorporation, did not act for their own personal or private benefit and to the detriment of the corporation or of its stockholders and creditors, is based upon the same accounting data and expert testimony.

Laborde, testifying for the claimants, made it perfectly clear that the depletion of the capital account in favor of a debt account was for the purpose of equalizing the capital investments of the partners and to reduce tax liability when there were profits to distribute. It is therefore certain, contrary to the finding just noted, that, in withdrawing this capital, Fazio and Ambrose did act for their own personal and private benefit.

It is equally certain, from the undisputed facts, that in so doing they acted to the detriment of the corporation and its creditors. The best evidence of this is what happened to the business after incorporation, and what will happen to its creditors if the reduction in capital is allowed to stand. The likelihood that business failure would result from such undercapitalization should have been apparent to anyone who knew the company's financial and business history and who had access to its balance sheet and profit and loss statements. Three expert witnesses confirmed this view, and none expressed a contrary opinion.

■ Accordingly, we hold that the factual conclusion, that the claimants, in withdrawing capital, did not act for their own personal or private benefit and to the detriment of the corporation and creditors, is clearly erroneous.

■ Recasting the facts in the light of what is said above, the question which appellant presents is this:

Where, in connection with the incorporation of a partnership, and for their own personal and private benefit, two partners who are to become officers, directors, and controlling stockholders of the corporation, convert the bulk of their capital contributions into loans, taking promissory notes, thereby leaving the partnership and succeeding corporation grossly undercapitalized, to the detriment of the corporation and its creditors, should their claims against the estate of the subsequently bankrupted corporation be subordinated to the claims of the general unsecured creditors?

The question almost answers itself.

■ In allowing and disallowing claims, courts of bankruptcy apply the rules and principles of equity jurisprudence. Pepper v. Litton, 308 U.S. 295,

---

**8.** See Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 310, 59 S.Ct. 543, 545, 83 L.Ed. 669.

304, 60 S.Ct. 238, 84 L.Ed. 281. Where the claim is found to be inequitable, it may be set aside (Pepper v. Litton, supra), or subordinated to the claims of other creditors.[9] As stated in Taylor v. Standard Gas Co., supra, 306 U.S. at page 315, 59 S.Ct. at page 547, the question to be determined when the plan or transaction which gives rise to a claim is challenged as inequitable is "whether, within the bounds of reason and fairness, such a plan can be justified."

 Where, as here, the claims are filed by persons standing in a fiduciary relationship to the corporation, another test which equity will apply is "whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain." Pepper v. Litton, supra, 308 U.S. at page 306, 60 S.Ct. at page 245.[10]

Under either of these tests, the transaction here in question stands condemned.

Appellees argue that more must be shown than mere undercapitalization if the claims are to be subordinated. Much more than mere undercapitalization was shown here. Persons serving in a fiduciary relationship to the corporation actually withdrew capital already committed to the business, in the face of recent adverse financial experience. They stripped the business of eighty-eight per cent of its stated capital at a time when it had a minus working capital and had suffered substantial business losses. This was done for personal gain, under circumstances which charge them with knowledge that the corporation and its creditors would be endangered. Taking advantage of their fiduciary position, they thus sought to gain equality of treatment with general creditors.

In Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669, and some other cases, there was fraud and mismanagement present in addition to undercapitalization. Appellees argue from this that fraud and mismanagement must always be present if claims are to be subordinated in a situation involving undercapitalization.

This is not the rule. The test to be applied, as announced in the Taylor case and quoted above, is whether the transaction can be justified "within the bounds of reason and fairness." In the more recent Heiser case, supra, 327 U.S. pages 732–733, 66 S.Ct. at page 856, the Supreme Court made clear, in these words, that fraud is not an essential ingredient:

"* * * In appropriate cases, acting upon equitable principles, it [bankruptcy court] may also subordinate the claim of one creditor to those of others in order to prevent the consummation of a course of conduct by the claimant, which, as to them, would be fraudulent *or otherwise inequitable.* * * *" (Emphasis supplied.)

The fact that the withdrawal of capital occurred prior to incorporation is immaterial. This transaction occurred in contemplation of incorporation. The participants then occupied a fiduciary relationship to the partnership; and expected to become controlling stockhold-

9. Heiser v. Woodruff, 327 U.S. 726, 733, 66 S.Ct. 853, 90 L.Ed. 970; Pepper v. Litton, supra, 308 U.S. page 310, 60 S. Ct. at page 246; Bank of America Nat. Trust & Sav. Ass'n v. Erickson, 9 Cir., 117 F.2d 796; L & M Realty Corporation v. Leo, 4 Cir., 249 F.2d 668, 670; International Telephone & Telegraph Corp. v. Holton, 4 Cir., 247 F.2d 178, 182; Wheeling Valley Coal Corp. v. Mead, 4 Cir., 171 F.2d 916, 921.

10. Claims based on transactions involving officers, directors, or controlling stockholders of the bankrupt corporation are always suspect. As the court said in Pepper v. Litton, supra, 308 U.S. at pages 307–308, 60 S.Ct. at page 246: "* * * In the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate. And its duty so to do is especially clear when the claim seeking allowance accrues to the benefit of an officer, director, or stockholder. * * *"

ers, directors, and officers of the corporation. This plan was effectuated, and they were serving in those fiduciary capacities when the corporation assumed the liabilities of the partnership, including the notes here in question.

Nor is the fact that the business, after being stripped of necessary capital, was able to survive long enough to have a turnover of creditors a mitigating circumstance. The inequitable conduct of appellees consisted not in acting to the detriment of creditors then known, but in acting to the detriment of present or future creditors, whoever they may be.

In our opinion, it was error to affirm the order of the referee denying the motion to subordinate the claims in question. We do not reach appellant's other major contention, that the notes are not provable in bankruptcy because they were to be paid only out of profits, and there were no profits.

Reversed and remanded for further proceedings not inconsistent with this opinion.