OLYMPIC FINANCE CO., Appellant,

v.

Thomas R. THYRET, Trustee in Bankruptcy for Azure Hills Club, Inc., Bankrupt, Appellee.

No. 18874.

United States Court of Appeals
Ninth Circuit.

Oct. 6, 1964.

---

5. See the dissenting opinion of Mr. Justice Frankfurter in Larson v. Domestic & Foreign Corp., 337 U.S. 682, 712, 69 S. Ct. 1457.

Joseph Stell, Walter L. Weisman, Herbert Murez, Los Angeles, Cal., for appellant.

Ronald E. Gordon, Buchalter, Nemer, Fields & Savitch, Los Angeles, Cal., for appellee.

Before BARNES, Circuit Judge, MADDEN, Judge, United States Court of Claims, and MERRILL, Circuit Judge.

BARNES, Circuit Judge.

This case arises on appeal from a district court affirmance of a referee's order denying Olympic Finance Company's petition of August 16, 1962 to reclaim certain personal property from the trustee in bankruptcy. Olympic Finance Company (herein referred to as "Olympic") asserted its right to the property on the ground that the bankrupt, Azure Hills Club, Inc., (herein referred to as "Azure") had defaulted on its rental payments to Olympic, the assignee of the personal property lease agreements. The order denying the petition based its findings on the existence of a novation in the form of an escrow agreement of August 29, 1960. This novation extinguished all prior rights and obligations of the parties with respect to the personal property lease agreements as well as certain conditional sale contracts covering the same personal property. The court below had jurisdiction. 11 U.S.C. § 11, sub. a (10). So have we on this appeal. 11 U.S.C. § 47.

The events leading up to the escrow agreement of August 29, 1960 (the alleged novation) are as follows:

On October 8, 1957, a personal property lease agreement was entered into between D. A. Financial Service Co., Inc., lessor (herein referred to as "D.A. Financial") and Azure, lessee. The lease period was eight years and the rent amounted to $269,336.62, payable $61,807.06 on October 8 and $5,764.71 on November 10, 1957, and each successive month up to and including October 10, 1960. D. A. Financial also granted Azure an option to purchase the personal property for $5,639.36.

The following day, October 9, 1957, D. A. Financial made a conditional sale purchase from Interstate Restaurant

Supply Co. of the property it had leased the day before.

Later that month, Interstate assigned its interests as conditional sales vendor to Bank of America. D. A. Financial also assigned to Bank of America its interests in the October 8 lease with Azure.

An identical four-party transaction was consummated for a somewhat lesser amount of personal property in December 1957.

On August 29, 1960, an agreement was executed by Olympic, Azure and Riverside Commissary, Inc. (an affiliate of Azure) entitled "Borrower's and Lender's Escrow Instructions and Agreement." Pursuant to this agreement, the leases and contracts described above were to be purchased by Olympic. Azure executed to Olympic a promissory note for $62,355.36; a deed of trust securing said note; and a chattel mortgage on the personal property in question. The amount of the promissory note was calculated as follows:

"Payee has loaned to payors the sum of $36,766.86; in addition to that, it has purchased Lessor's interest and the Titleholder's interest in certain Lease Agreements covering certain personal property, which said Lease Agreements are badly in default, for an amount represented by payors to be equivalent to the balance of its obligation under said Lease Agreements, plus an amount sufficient to exercise an option to purchase said personal property, the latter two amounts totaling $38,444.64. The difference between the amount loaned hereunder and the amount of this note is a figure representing 2.5% per month interest on $75,000.00."

On September 6, 1960, Olympic purchased and acquired from Bank of America the interest previously assigned to the latter by D. A. Financial, the conditional vendee and lessor. Ivar Investment Co., Olympic's wholly-owned subsidiary, acquired the title holder's interest. Olympic paid $32,952.59 and Ivar paid $5,523.62. These amounts were in addition to the $62,355.36 promissory note executed by Azure.

Repayment of the principal paid by Olympic and Ivar for the interests in the personal property was to be made under the following deferred payment plan:

" * * * the [$32,952.59] obligation of [Azure] under said [lease] agreements and for the option to purchase may be satisfied by a first payment of $644.64 beginning December 5, 1961 and nine equal monthly payments of $4,200.00 beginning January 5, 1962, with the last monthly payment due September 5, 1962, being the total sum of $38,444.64. * * * "

On July 25, 1962, Azure filed its petition in bankruptcy and was adjudicated a bankrupt. On September 19, 1962, Olympic filed its reclamation petition.

On these facts recited the following questions are presented:

1. Does the escrow agreement of August 29, 1960 constitute a novation?

a. What was the parties' intent concerning the effect of the obligations created by the escrow agreement on prior obligations?

b. Does Ivar's separate corporateness preclude a finding of a novation?

c. Does the written language of the deferred repayment plan preclude a finding of a novation?

d. Does appellant's evidence in the form of a colloquy between counsel preclude a finding of a novation?

2. In the event this court determines the escrow agreement did not constitute a novation, what is the respect this court must extend to the referee's finding, affirmed by the district court?

We conclude the decision of the referee, affirmed by the district court, should be affirmed.

The question of whether or not the escrow agreement of August 29, 1960 was a novation of the preexisting contractual obligations between Olympic and Azure

must rest upon the facts of the case. They could unquestionably lead reasonable men to opposite conclusions. But there were substantial changes in the rights and obligations of the parties evolving from the escrow agreement of August 29, 1960. These cause us to conclude a novation occurred. The existence or absence of a novation is determined inferentially, when not specifically, by the trier of fact. Whether a strict or liberal approach to the scope of appellate review is applied, this court should follow the decision of the referee, affirmed by the trial judge, where the facts allow reasonable men to differ in conclusion.

### I—What constitutes a novation?

The California Civil Code § 1530 defines a novation as follows: "Novation is the substitution of a new obligation for an existing one." The trustee's argument, adopted by the referee and district court, was that the escrow agreement of August 29, 1960 was a novation, discharging Azure from its obligations under the personal property lease agreements and conditional sales contracts. Appellant, to the contrary, points to the continued existence of Azure's rental obligations and its consequent defaults in rental payments to the appellant—the present possessor of the leasehold interests. This default, asserts the appellant, entitles Olympic to reclaim the personal property in question.

No definitive formula exists to distinguish a mere contractual modification from a novation. Section 1531 of the California Civil Code states: "Novation is made: 1. By the substitution of a new obligation between the same parties, with intent to extinguish the old obligation * * *." A somewhat more elaborate judicial definition was given by the California courts in Young v. Benton, 21 Cal.App. 382, 131 P. 1051 (1913):

"Novation * * * implies four essential requisites: (1.) A previous valid obligation; (2.) the agreement of all the parties to the new contract; (3.) the extinguishment of the old contract; and (4.) the valid-

ity of the new one." Id. at 384, 131 P. at 1052.

In the more recent case of Alexander v. Angel, 37 Cal.2d 856, 236 P.2d 561 (1951), a further allusion was made to the difficulty of defining a novation:

"While the evidence in support of a novation must be 'clear and convincing' * * *, the 'whole question is one of fact and depends upon all the facts and circumstances of the particular case' * * *, with the weight and sufficiency of the proof being matters for the determination of the trier of the facts under the general rules applicable to civil actions." Id. at 860–61, 236 P.2d at 563.

In the light of the above, we note that case precedent is not helpful in assessing whether a novation has been consummated; each case is resolved on the basis of its own fact pattern. For example, in Bowden v. Bank of America, 36 Cal. 2d 406, 224 P.2d 713 (1950), the bankrupt purchased a number of motor vehicles for business use with the assistance of a variety of financial arrangements with defendant bank. After a partial reduction of the indebtedness, at the request of the bankrupt, the entire liability was consolidated into one promissory note, secured by a single chattel mortgage. The bank did not seasonably record the mortgage, but when the bankrupt defaulted under the note, the defendant bank took possession of the vehicles. The trustee claimed that the consolidation in a single note and chattel mortgage effected a novation, and defendant's delinquency in recording precluded it from reclaiming the vehicles. On this fact situation, in the absence of new debts and obligations, the California Supreme Court held the consolidation was not a novation. Similarly, in National Pacific Oil Co. v. Watson, 184 Cal. 216, 193 P. 133 (1920), after it was discovered that immediate possession could not be given under a contract for the sale of land, a rearrangement relating to the matter of payments was not considered a novation of the contract.

But the California courts have found the existence of a novation on the basis of a particular factual setting, rather than any governing legal precedent. Simmons v. Sweeney, 13 Cal.App. 283, 109 P. 265 (1910) involved an action by a real estate broker to recover damages for breach of a written contract to pay one-third of all profit from a sale of land at $19,000. The court found that this written contract was superseded by a subsequent oral contract by which the broker was permitted to sell the land at auction; the owner was to receive $21,000 and the broker anything in excess. The court in this situation determined the oral contract was a novation because the terms of the two contracts were so entirely inconsistent, and could not possibly be operative at the same time.

■ Further examination of case precedent seems unnecessary to substantiate the premise that whether or not a novation exists will depend primarily upon the individual facts of each case.

### II—The effect of the escrow agreement.

To determine whether the escrow agreement here involved was intended to have the legal effect of a novation, it is necessary to contrast the respective rights and obligations of the parties before and after the effective date of this instrument. Prior to August 29, 1960, Azure had the following financial burden under the lease agreements and purchase option:

1. Lease of 10/8/57—Payment of $5,764.71/mo.

2. Lease of 12/19/57—Payment of $447.85/mo.

3. Option to buy personal property for $5,280.50.

Subsequent to August 29, 1960, a number of substantial changes appeared in the respective rights and obligations of the parties:

1. A new $62,355.56 promissory note was executed. This note included a newly created consideration of 2.5 per cent per month interest, not only on the amount of the loan but also on the amount paid out by Olympic and Ivar to acquire the personal property leases and title holders' interests.

2. Repayment of the principal amounts expended by Olympic and Ivar were deferred until the entire amount due on the promissory note was repaid. Monthly rental payments thus ceased, and were replaced by monthly payments on a promissory note which included an interest charge on the total amount of the deferred rental payments.[1]

3. The option to purchase the personal property was converted into a legal commitment for Azure. The deferred payment schedule included an amortization of the amount Azure previously could have elected to pay to exercise its option rights.

4. As additional factors, to secure the promissory note, Azure was required to execute a chattel mortgage on the personal property involved, and Azure and Commissary were required to execute a deed of trust on their respective pieces of real property. Additionally new penalty provisions for prepayment or delinquent payment were incorporated in the promissory note.

Although no one of the above factors, standing alone, might be sufficient to turn a contractual revision into a novation, when all are considered as a unit in contrasting the rights and obligations of the parties prior to the escrow agreement, and after it, the intent of the parties as evidenced by the agreement would reasonably appear to be to extinguish the former obligations, and to replace them with a new set.

---

1. To illustrate this point with an example: It can be assumed that prior to the escrow agreement rental payments in the sum of $10,000 remained due, to be paid in equal $1,000 installments over the following ten months. Subsequent to the agreement, payment of this $10,000 would be deferred until after repayment of a newly consummated loan; yet $250 (2.5%) additional interest charge per month would commence immediately as a result of the deferral.

### III—The separate corporate existence of Ivar and Commissary.

The separate corporate existence of Ivar and Commissary, parties to the escrow agreement, separate and apart from Olympic and Azure respectively, is not persuasive in negating the existence of a novation. To disregard the essence of a transaction on the basis that a party chose to use as his agent a separate corporate entity would be to disregard reason and promote an injustice. The referee found that Ivar acted as agent for its parent. And the parties themselves, in the promissory note, in the escrow agreement, and even in open court, treated Olympic and Azure alone as the principals to the transactions involved.

### IV—The language of the deferred payment plan.

Under the deferred payment plan, Azure was to satisfy its obligation to Olympic under the lease agreements and option to purchase after it had satisfied its liability on the promissory note. The escrow agreement states that the obligation "may be satisfied by the payments of a first payment of $644.64 beginning January 5, 1962, with the last monthly payment due September 5, 1962, being the total sum of $38,444.64. * * *" Counsel for appellant laid great emphasis on the precatory nature of the word "may" in this provision. Such a permissive reference, it was asserted, could hardly serve as a new obligation, completely superseding the old. This argument is not persuasive when the word "may" is read in context. It strains a reasonable reading of the provision to construe it as permissive rather than mandatory. Read in context, this permissive word assumes the stature of a legal obligation.

### V—Colloquy between counsel.

For the first time, appellant contends on appeal that a colloquy between counsel at the proceedings of December 7, 1962 served as a stipulation conclusively proving the continuing operation of the 1957 lease agreements. To resolve this controversy on the basis of a verbal exchange in court where it was not readily apparent a stipulation was actually being entered into would serve only to avoid the very issue of the case. The colloquy referred to by appellant can be interpreted as presentation of appellant's evidence on the question of intent, with counsel for appellee offering no more than token resistance to the admission of such evidence. It seems apparent from the record (Vol. II of December 7, 1962, pp. 1–3), as well as appellant's failure to raise this colloquy at any earlier stage, that had counsel for the appellee realized a stipulation was intended for the proposition now urged, the proceedings might well have continued in a different light.[2]

The facts of this colloquy differ markedly from the stipulations made in Burstein v. United States, 232 F.2d 19 (8th Cir. 1956), relied on by appellant. In that case a controversy arose as to the cost and quantity of yards of material needed to manufacture certain articles of clothing. The parties *expressly stipulated* one set of figures before the trial court, and this set was unequivocally ·adopted on appeal by the court. There was no area of doubt in the mind of either counsel as to the facts stipulated to before the trial judge. Such a clear factual situation does not here exist.

### VI—Scope of judicial review.

█ If the escrow agreement of August 29, 1960 in fact is deemed to be a novation, the question of the scope of the appellate court's review becomes a moot

2. The stipulation was not that there was "a continuing operation of the 1957 agreement," as now urged, but that after the escrow agreement date of August 29, 1960, "Olympic never requested payment of rent on leases between Azure and Interstate." Counsel for trustee: "We don't say that Olympic didn't ask for payment under this agreement. We say they did not ask for payment specifically in the amounts called for by the leases." Counsel for Olympic: "I would stipulate to that."

one. But, if one were to deduce from the facts of the case that a novation did not occur, the question of the proper scope of judicial review would necessarily arise.

Rule 52(a) of the Federal Rules of Civil Procedure prescribes that findings of fact in actions tried without a jury "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." The United States Supreme Court further refined this standard in United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948) when it stated:

> "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Id. at 395, 68 S.Ct. at 542.

Much can be said in the case at hand for a higher degree of appellate review in light of the absence of any need to judge the credibility of witnesses before the referee; the reviewing court is in an equally advantageous position to make factual inferences from an agreed-upon set of events. Yet it seems incumbent to exercise some degree of judicial restraint in regard for the expertise of the referee in bankruptcy. The ninth circuit has exercised such restraint. In Costello v. Fazio, 256 F.2d 903 (9th Cir. 1958), the court noted the greater area for review when credibility was not in question:

> "Where a finding of fact by the referee is based upon conflicting evidence, or where the credibility of witnesses is a factor, a district court and, on appeal, a court of appeals will seldom hold such a finding clearly erroneous. The same reluctance is not encountered with regard to a factual conclusion from given facts. In the latter case, the proper conclusion from given facts can be made by the trial judge, or the court

of appeals, as well as the referee."
Id. at 908.

Yet, in reversing the decision of the referee, the court in Fazio chose to do so only by holding the finding of the referee "clearly erroneous."

The Fazio rule was somewhat amplified and the extent of judicial restraint was articulated in the case of Hoppe v. Rittenhouse, 279 F.2d 3, 9 (9th Cir. 1960):

> "The rule applied in Fazio is pertinent where the primary facts can fairly be said to admit of but one reasonable conclusion, and yet this principle does not change the equally settled rule that where the basic and undisputed facts are fairly susceptible of diverse inferences requiring different conclusions, the determination made by the trier of fact is conclusive on review unless that finding is 'clearly erroneous'."

In addition, General Order in Bankruptcy No. 47, by adopting "clearly erroneous" language, seems to encourage an exercise of a considerable degree of judicial restraint. 11 U.S.C. § 53.

Finding no error, we affirm.