In the Matter of BRUNNER AIR COMPRESSOR CORP., Bankrupt.

No. 66–BK–530.

United States District Court
N. D. New York.

July 15, 1968.

Laurence F. Sovik, of Smith, Sovik, Terry, Kendrick, McAuliffe & Schwarzer, Syracuse, N. Y., for Trustee.

Bruce B. Roswig, of Costello, Cooney & Fearon, Syracuse, N. Y., for debenture holders H. S. Sheble, and others, Estate of J. H. Sheble and R. N. Sheble.

Richard Kehoe, of Ferris, Kehoe, Tenney & Murname, Utica, N. Y., for debenture holders Anthony J. Barrett, Ellen M. Cooney, Frank M. Dulan, William J. Hogenkamp, Gertrude F. Karl, John F. Karl, Robert Costello and Annamary Costello.

TIMBERS, District Judge.*

## QUESTION PRESENTED

In this proceeding, pursuant to Section 39c of the Bankruptcy Act, 11 U.S.C.

---

* Chief Judge of the District of Connecticut, sitting by designation.

§ 67(c) (1964), on petitions to review an order of Honorable David J. Goldstein, Referee in Bankruptcy, entered November 13, 1967, the question presented is whether the Referee erred in subordinating claims of certain debenture holders of the debtor, Brunner Air Compressor Corp., to claims of general unsecured creditors upon the ground that advances of the debenture holders were in reality capital contributions rather than loans.

▬▬▬ The Court holds (1) that there was substantial evidence to support the Referee's finding that the debtor corporation was undercapitalized from June 13, 1963, the date of its organization, to the date of bankruptcy, and as to that finding the order of the Referee is affirmed; but (2) with respect to the Referee's conclusion that the claims of the debenture holders[1] should be subordinated to the claims of general unsecured creditors, the order of the Referee is reversed and the case is remanded to the Referee with instructions (a) to dismiss the trustee's subordination petition of July 6, 1967 as to the claims of all debenture holders who at no time were officers or directors of the debtor, and (b) to hold a further hearing and make appropriate findings, conclusions and an order, not inconsistent with this opinion, with respect to those debenture holders who at any time were officers or directors of the debtor, for the purpose of determining the ability and intent of any such officers or directors, or combination thereof, to dominate the corporation to their advantage and to the detriment of creditors.

## FACTS

The debtor, Brunner Air Compressor Corp., was organized as a New York corporation on June 13, 1963, to manufacture and sell a line of air compressors. It opened a place of business in Chadwicks, New York, and began doing business in early 1964.

The board of directors at its first meeting on June 14, 1963 authorized the issuance and sale, through a private offering, of 20,000 shares of common stock, par value $1.00; it also authorized the issuance and sale in like manner of 6% subordinated debentures in units of $500, due December 31, 1968, in an aggregate principal amount of $300,000.

The stock and debentures were purchased for the most part by the same individuals at cost ratios ranging from approximately 1:10 to 1:25, that is, cost of stock to debentures. Some 37 separate individuals purchased securities during the period 1963–1966 (mostly during 1963 and 1964); of these, 30 purchased stock and debentures, 4 purchased only stock and 3 purchased only debentures. No stockholder owned more than 14% of the stock; that was the Estate of J. H. Sheble which purchased $2700 of stock and $36,250 of debentures. The company's financing raised $19,630 from the sale of stock, $188,750 from debentures and $75,000 from a bank loan in May 1964 from the Marine Midland Trust Company of the Mohawk Valley, participated in by the Small Business Administration.[2]

The debentures[3] were sold upon the express understanding that they were subordinated to "all Senior Indebtedness, as hereinafter defined." This was the

1. With the exception of the debenture held by Utica General Jobbing Foundry, Inc., which the Referee concluded, having been given by the debtor in payment of a debt due for work, labor and services, should not be subordinated. The Court affirms the Referee's conclusion as to this debenture holder.

2. This bank loan constituted the debtor's only senior indebtedness; both the Marine Midland and the SBA had been fully

paid off by the trustee prior to the hearings in the instant proceedings before the Referee. Hence, there are no claims of senior indebtedness outstanding against the debtor.

3. See APPENDIX A, a sample of the debentures issued by the debtor (the sample being the $5,000 debenture issued to J. Howard Sheble, Jr. on September 3, 1964).

only condition of subordination in the debentures. "Senior Indebtedness" was defined in the debentures as "the principal of, and interest on, indebtedness heretofore or hereafter incurred by the Company for money borrowed from banks, trust companies, insurance companies and other financial institutions and investing organizations, evidenced by notes, bonds, debentures or similar obligations and any and all renewals, extensions, refundings, amendments and modifications of any of the foregoing." In short, so far as the issues here are concerned, there is no present indebtedness of the debtor to which the debentures by their terms are subordinated.

In all respects, the debentures have the indicia of the conventional debenture bond. They are payable in a fixed sum, at a fixed time and at stated interest due in specified installments. Payment of interest is in no way dependent on earnings. They have standard default, redemption and acceleration clauses. They are subordinated by their terms to only one class of indebtedness. The debenture holders are given no rights to control. The debentures have none of the characteristics of stock.

Some debenture holders were officers and directors; but the composition of the officers and directors changed in part during the company's existence.

The debtor lost money continuously from the time it started operations until it went into bankruptcy in May 1966. By December 1964, at least some members of the board of directors felt that lack of working capital was holding back the company.

The debtor was adjudicated a bankrupt as a result of an involuntary petition filed in May 1966. Among the petitioning creditors were two debenture holders. The debentures were then in default for non-payment of interest.

The trustee in bankruptcy, William A. Schmitt, during the summer of 1966 completed a sale of the debtor's business as a unit, from the proceeds of which the Marine Midland and SBA loans were paid off.

The instant proceedings to expunge the claims of the debenture holders or to subordinate them to the claims of general unsecured creditors were instituted before the Referee in July 1967.

## PROCEEDINGS BEFORE REFEREE

Upon petition of the trustee, the Referee on July 6, 1967 issued an order to show cause, returnable July 19, requiring certain named debenture holders to show cause "why their claims filed herein should not be either expunged or subordinated to all other claims of general unsecured creditors as being in fact and effect capital contributions to the Bankrupt and not loans as asserted in their claims filed herein."

At the July 19 hearing before the Referee, the trustee called one witness, George W. Ledermann, secretary and later treasurer of the company. Through him, the trustee introduced a copy of the debenture, certain books of account, corporate records and financial statements of the company. Ledermann also testified in explanation of certain portions of the books and records. The trustee then rested. Counsel for the debenture holders moved to dismiss the trustee's petition on the ground that he had failed to prove his case. The Referee did not act on that motion, but adjourned the matter to August 9.

At the resumed hearing on August 9, the trustee again stated that he had rested his case and moved "for an order subordinating the claims of those persons who haven't appeared today." The Referee replied, "Well, they're not appearing, you may take your order as far as they're concerned. They've been on notice." Actually, the record indicates that the trustee's petition in support of the order to show cause issued on July 6 had never been served on any of the debenture holders; and the record is bewildering, to put it mildly, as to who

actually entered appearances for which debenture holders.[4] The matter was further adjourned to August 30.

At the final hearing on August 30, William F. Ryan, a debenture holder who also owned stock, testified that he had bought his debentures and stock through an acquaintance who represented to him that the company would be a good investment. The trustee reasserted that he had rested. Counsel for the debenture holders renewed his motion to dismiss the trustee's petition on the ground that he had failed to prove facts to sustain the order to show cause. The Referee again did not act on the motion, but granted leave to all parties to submit briefs which in due course were filed.

The Referee on October 30 filed his decision setting forth findings of fact and conclusions of law. On November 13, the Referee entered his order that the claims of all debenture holders, except that of Utica General Jobbing Foundry, Inc. (see note 1, supra), "are in equity subordinated in dividend distribution to the claims of general unsecured creditors."

Timely petitions to review the Referee's order of November 13 have been filed by the debenture holders on whose behalf appearances in this Court are noted above.

## CLAIMS OF THE PARTIES

The position of the trustee essentially is that, since the debtor's books indicate that the company was undercapitalized from its inception, the advances by the debenture holders (who for the most part are also stockholders) were contributions to capital rather than loans; and therefore it would be inequitable to accord to the debenture holders a parity with the general unsecured creditors. The trustee argues that broad equitable principles, under the circumstances here presented, "prevent the depletion of the

dividend to general creditors who have never been insiders and who have no first hand knowledge of the bankrupt's capital structure by requiring them to share the estate with those very persons who launched the corporation on its unsuccessful venture and who, had it been successful, would have been the profiteers".

The position of the debenture holders, on the other hand, may be briefly summarized: mere identity of debenture holders and stockholders does not invalidate a bona fide debt; undercapitalization is not established solely by corporate records that show a low debt-equity ratio; even assuming thin capitalization, this alone does not warrant subordinating the claims of debenture holders; and, at the very least, the debenture holders should have been permitted their day in court to introduce evidence to show the absence of domination of the corporation by the debenture holders to their advantage or to the detriment of creditors.

## OPINION

There are two essential elements of the trustee's case seeking to subordinate the claims of debenture holders to the claims of general unsecured creditors: (1) that the debtor was undercapitalized from the date of its organization in June 1963 to the date of bankruptcy, and (2) that the debenture holders were in a position to, and in fact did, dominate the debtor by inequitable conduct to their advantage and to the detriment of creditors.

The Court holds that the trustee has established essential element (1), but that he has failed to establish essential element (2).

*Undercapitalization Of Debtor Corporation*

While it would have been preferable for the trustee to have offered, and for

---

4. In view of the Court's decision herein ordering a remand to the Referee for further proceedings not inconsistent with this opinion, there is no need for the Court to attempt to unravel the proce-

dural morass referred to. The rights of all debenture holders who have filed proofs of claim as required by law will be fully protected in accordance with this decision.

the Referee to have received, interpretive testimony of expert witnesses to show whether the paid-in capital of the debtor corporation at the time of its organization, or at the time it began doing business, was adequate for the contemplated scope and magnitude of the corporation's business, Costello v. Fazio, 256 F.2d 903, 908–09 (9 Cir. 1958),[5] the Referee's finding that the debtor was undercapitalized from the date of its organization in June 1963 to the date of bankruptcy is supported by substantial evidence; such finding, not being clearly erroneous, is affirmed. General Order in Bankruptcy No. 47; cf. Rules 52(a) and 53 (e) (2), Fed.R.Civ.P.

As both sides point out in their briefs, aside from the low debt-equity ratio established by the debtor's books, in the first year after the corporation was organized the capital stock issued was 8.5% of debentures payable and in the first year of the corporation's business operations stock was 10.6% of debentures payable. Most purchases of stock and debentures were completed by the end of 1964, which was the end of the corporation's first year of business.

The trustee further points out that the debtor's financial statement for 1964 shows as of that date that paid-in capital was less than the manufacturing expenses, less than the general and administrative expenses and less than the selling expenses for the first year; it was $\frac{1}{14}$ of the first year's net sales, $\frac{1}{18}$ of total liabilities and $\frac{1}{8}$ of current liabilities; and it was less than the net loss incurred by the corporation.

The minutes of the December 29, 1964 meeting of the board of directors recite that ". . . it was the sense of the members of the Board who were part of Management that it was lack of working capital rather than difficult supply

lines which was holding the Company back. . . ." The loss after the first year of business, 1964, was $24,114; after the second year of business, 1965, it was $105,416; and when the corporation went into bankruptcy in May 1966, it had never made a profit.

Whether the debtor at any time during its corporate existence was even "two jumps ahead of the wolf", Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 310 (1939), is doubtful. In any event, upon the undisputed record before the Referee, consisting almost entirely of the debtor's books of account, corporate records and financial statements, the Referee's finding of undercapitalization is not clearly erroneous. In re Morasco, 233 F.2d 11, 15 (2 Cir. 1956). "It does not require the confirmatory opinion of experts to determine from this data that the corporation was grossly undercapitalized." Costello v. Fazio, supra, at 908.

Upon the ultimate question, however, of whether claims of the debenture holders should be subordinated to claims of general unsecured creditors, the Referee's finding of undercapitalization is not the end but merely the beginning of the inquiry. We turn now to the more difficult and critical issue of whether there was evidence that the debenture holders were in a position to, and in fact did, dominate the debtor corporation by inequitable conduct to their advantage and to the detriment of creditors.

*Alleged Inequitable Conduct Of Debenture Holders Through Domination Of Debtor Corporation*

 Any consideration of the equitable powers of the bankruptcy court to subordinate a duly filed proof of claim which is presumed to be valid, Section 57(a) of the Bankruptcy Act, 11 U.S.C.

---

5. In *Costello*, while the court of appeals reversed the district court's affirmance of the Referee's finding that the corporation was adequately capitalized at the time of its incorporation and noted that the confirmatory opinion of experts was not required to supplement the account-ing data to this effect, 256 F.2d at 908, the court of appeals nevertheless summarized at some length the testimony of four expert witnesses who expressed opinions on the question of undercapitalization. Id. at 906–08.

§ 93(a) (1964), necessarily must begin with the leading case of Pepper v. Litton, 308 U.S. 295 (1939). Although clearly distinguishable from the instant case on the facts, certain basic principles enunciated in *Litton* are controlling here. They are:

> "That equitable power also exists in passing on claims presented by an officer, director, or stockholder in the bankruptcy proceedings of his corporation. The mere fact that an officer, director, or stockholder has a claim against his bankrupt corporation or that he has reduced that claim to judgment does not mean that the bankruptcy court must accord it *pari passu* treatment with the claims of other creditors. Its disallowance or subordination may be necessitated by certain cardinal principles of equity jurisprudence. A director is a fiduciary. Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 588. So is a dominant or controlling stockholder or group of stockholders. Southern Pacific Co. v. Bogert, 250 U.S. 483, 492. Their powers are powers in trust. See Jackson v. Ludeling, 21 Wall. 616, 624. Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 599. The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside. While normally that fiduciary obligation is enforceable directly by the corporation, or through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the trustee. For that standard of fiduciary obligation is designed for the protection of the entire community of interests in the corporation—creditors as well as stockholders.

> As we have said, the bankruptcy court in passing on allowance of claims sits as a court of equity. Hence these rules governing the fiduciary responsibilities of directors and stockholders come into play on allowance of their claims in bankruptcy. In the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate. And its duty so to do is especially clear when the claim seeking allowance accrues to the benefit of an officer, director, or stockholder.

> \* \* \*

> And so-called loans or advances by the dominant or controlling stockholder will be subordinated to claims of other creditors and thus treated in effect as capital contributions by the stockholder not only in the foregoing types of situations but also where the paid-in capital is purely nominal, the capital necessary for the scope and magnitude of the operations of the company being furnished by the stockholder as a loan." [Citations to footnotes omitted] Id. at 306–08, 309–10.

 The teaching of *Litton*, as applied to the instant case, may be briefly summarized: the bankruptcy court, as a court of equity, must apply basic principles of equity in passing upon claims of those who occupy positions of fiduciary responsibility; officers, directors or dominant stockholders are fiduciaries whose claims should be rigorously scrutinized; when challenged, such fiduciaries have the burden of establishing the good faith of the transactions upon which their claims are based, as well as their inherent fairness to the corporation and to others having interests in the corporation; the essential test of good faith and fairness is whether the transaction was an arm's length bargain; and among the transactions which should be scrutinized in accordance with

this test are loans or advances by such fiduciaries, including dominant stockholders, to corporations whose paid-in capital is nominal.

Here the undercapitalization of the debtor corporation has been established. But that alone is not sufficient to brand the advances made by the debenture holders as contributions to capital rather than loans. "[W]hether an advance is a loan or is capital depends on the intent of the parties, and this intent is to be ascertained from all relevant facts and circumstances." Rowan v. United States, 219 F.2d 51, 54 (5 Cir. 1955). The court in *Rowan* went on to state:

"Many students of tax law have discussed the inadequately capitalized corporation, sometimes popularly known as the 'thin corporation.' The court, of course, recognizes the fact that stockholders who lend money to their own corporation obtain all the advantages of favorable tax treatment if the enterprise fails. *But the court also recognizes that, entirely without reference to the incidence of taxes, stockholders of corporations have always been free to commit to corporate operations such capital as they choose and to lend such additional amounts as they may elect to assist in the operation if that is their true intent, always thus reserving the right to share with other creditors a distribution of assets if the enterprise fails. It would obviously work an unwarranted interference by the courts in ordinary and perfectly proper business procedures for us to say that there can be established, as a matter of hindsight, a ratio of stockholder owned debt to the capital of the debtor corporation.* No stockholder could safely advance money to strengthen the faltering steps of his corporation (which, of course, may be greatly to the benefit of other cred-

itors) if he is faced with the danger of having the Commissioner, with the backing of the courts, say, 'he had no right to launch a corporate business without investing in it all the money it needed, and investing it in the way that is most disadvantageous to himself, both as relates to taxation and as to other creditors.'" [Emphasis added] Id. at 55.

The mere fact that certain of the debenture holders, in addition to being stockholders, were also officers or directors of the debtor corporation, does not ipso facto strip their advances to the corporation of the attributes of a bona fide debt. In the first place, as noted at page 260, supra, the debentures have the indicia of the conventional debenture bond, and none of the characteristics of stock. Cf. In re Fechheimer Fishel Co., 212 Fed. 357, 360 (2 Cir. 1914). Secondly, a corporation properly may borrow money from an officer, director or stockholder, and either secure or not secure the indebtedness as it chooses, provided the transaction is an arm's length bargain, is not inherently unfair and does not constitute a breach of fiduciary duty owed by the officer, director or stockholder. Wages v. Weiner, 381 F.2d 667 (5 Cir. 1967); Small v. Williams, 313 F.2d 39 (4 Cir. 1963); Spach v. Bryant, 309 F.2d 886 (5 Cir. 1962); In re Madelaine, 164 F.2d 419 (2 Cir. 1947). As the Court of Appeals for this Circuit noted in *Madelaine*, "There is nothing illegal in an officer or director lending money to his corporation provided he does not use his corporate position to defraud creditors or take unfair advantage of them." Id. at 420.

In the instant case, so far as the trustee has attempted to subordinate the claims of debenture holders *who at no time were officers or directors of the debtor corporation,* he has utterly failed to sustain his burden of proof.[6] There

---

6. The burden of proof is clearly on the trustee to sustain his petition to subordinate the claims of debenture holders who were not officers or directors. As stated

in Sampsell v. Imperial Paper Corp., 313 U.S. 215, 219 (1941), "The power of the bankruptcy court to subordinate claims or to adjudicate equities arising out of

was no evidence that such debenture holders were ever in a position to dominate, or in fact did dominate, the corporation. Obviously in a corporation of this size and character, where no stockholder owned more than 14% of the stock, there was no dominant or controlling stockholder; and there is no evidence that any group of stockholders acted in concert in such a manner as to dominate the corporation. Moreover, the record is wholly devoid of any evidence that the non-officer or non-director debenture holders acted other than in good faith, in fairness and pursuant to arm's length bargains in advancing money to the corporation in return for their debentures. In short, there is not a scintilla of evidence of inequitable conduct on the part of these debenture holders, much less any evidence of conduct on their part which was detrimental to creditors. Accordingly, upon remand the Referee is directed to dismiss the trustee's subordination petition as to the claims of all debenture holders who at no time were officers or directors of the debtor corporation.

With respect to the claims of debenture holders *who at any time were officers or directors of the debtor corporation*, they are on quite a different footing. Since their claims were challenged by the trustee, the burden of going forward shifted to these debenture holders as fiduciaries to establish the good faith of the transactions upon which their claims are based, as well as their inherent fairness to the corporation. Pepper v. Litton, supra, at 306–08. Upon remand as to the claims of these debenture holders, the inquiry should be whether, as officers or directors, they possessed the ability and intent, acting

alone or in combination with others, to dominate, and in fact did dominate, the corporation to their advantage and to the detriment of creditors. Essentially, the test of good faith and fairness is whether, in the case of each of these debenture holders, the transaction by which each advanced money to the corporation in return for his debentures was an arm's length bargain. Pepper v. Litton, supra, at 306–07; Spach v. Bryant, supra, at 889. And ultimately the trustee's petition to subordinate the claims of these debenture holders to the claims of general unsecured creditors can be sustained only upon a finding, as to each such debenture holder, of a course of inequitable conduct which resulted in unfair advantage to the debenture holder and detriment to creditors. Heiser v. Woodruff, 327 U.S. 726, 732–33 (1946); In re Calpa Products Co., 249 F.Supp. 71, 73 (E.D.Pa.1965). Accordingly, as to the claims of those debenture holders who at any time were officers or directors of the debtor corporation, the case is remanded to the Referee to hold a further hearing and to make appropriate findings, conclusions and an order, not inconsistent with this opinion.[7]

*Conclusion*

Aside from the Court's legal conclusions, the Court agrees with the policy argument forcefully advanced by counsel for the debenture holders that to sustain the subordination petition of the trustee on the present state of the record in the instant case—holding in effect that, upon a finding of undercapitalization, the advances by debenture holders who also were stockholders should be treated as contributions to capital rather than loans—would have a chilling effect upon

the relationship between the several creditors is complete. Taylor v. Standard Gas & Electric Co., 306 U.S. 307; Pepper v. Litton, 308 U.S. 295; Bird & Sons Sales Corp. v. Tobin, 78 F.2d 371. But the theme of the Bankruptcy Act is equality of distribution. § 65-a; Moore v. Bay, 284 U.S. 4. To bring himself outside of that rule * * * [one] carries a burden of showing by clear and

convincing evidence that its application * * * would work an injustice."

7. The trustee has expressly disclaimed fraud on the part of the debenture holders; and fraud is not an essential element of the trustee's claim against even the debenture holders who were officers or directors. Heiser v. Woodruff, 327 U.S. 726, 732–33 (1946); Costello v. Fazio, 256 F.2d 903, 910 (9 Cir. 1958).

the development of new businesses. The method of financing here used was conventional and commonplace, particularly for small enterprises. Courts have long recognized and respected the broad latitude which necessarily must be given to those who organize and invest in business corporations to determine the appropriate capital structure, including the selection of a particular plan of ownership and classification of the interests of security holders. To sustain the trustee's broad position on the present state of the record, as did the Referee below, would seriously jeopardize the future use of this widely used and conventional method of financing new businesses. No private investor could be expected to invest in the debt securities of a corporation he does not control if he must run the risk of having his debt security classified as a stock in the event of the corporation's failure. Not even competent legal or accounting advice, if obtainable, could assure investors that debentures purchased by them might not be treated as stock in the event of bankruptcy. Such an inhibition on a perfectly normal and long-recognized method of financing is not only contrary to law but unwarranted as a matter of public policy.

## ORDER

ORDERED as follows:

(1) That the order of the Referee entered November 13, 1967 is affirmed insofar as it found the debtor corporation to have been undercapitalized from June 13, 1963, the date of its organization, to the date of bankruptcy.

(2) That the said order of the Referee, insofar as it concluded that the claims of debenture holders of the debtor corporation should be subordinated to the claims of general unsecured creditors, is reversed, and the case is remanded to the Referee with instructions:

(a) To dismiss the trustee's subordination petition of July 6, 1967 as to the claims of all debenture holders who at no time were officers or directors of the debtor corporation; and

(b) To hold a further hearing and make appropriate findings, conclusions and an order, not inconsistent with this opinion, with respect to those debenture holders who at any time were officers or directors of the debtor corporation.

## APPENDIX A

### SAMPLE DEBENTURE

BRUNNER AIR COMPRESSOR CORP.
6% SUBORDINATED DEBENTURE
Due December 31, 1968

— — — —

BRUNNER AIR COMPRESSOR CORP. (hereinafter called the "Company") a New York corporation is indebted and for value received hereby promises to pay to J. Howard Sheble, Jr. on the thirty-first day of December, 1968 (unless this Debenture shall have been duly called for a previous redemption and payment of the redemption price made or provided in accordance with the provisions for redemption hereinafter set forth) FIVE THOUSAND AND 00/100 — — — Dollars ( $5,000.00 ) in legal tender of the United States of America, on surrender of this Debenture, and to pay interest thereon from the date hereof until the Company's obligation with respect to the payment of such principal shall have been discharged, at the rate of 6%

per annum, on the last days of June and December in each year, beginning on the thirtieth day of June, 1963; all upon the following terms and conditions:

1. *Designation of Debentures.* This Debenture is one of a duly authorized issue of Debentures of the Company, designated as its 6% Subordinated Debentures, due December 31, 1968 (herein referred to as the "Debentures"), limited to the aggregate principal amount of Three Hundred Thousand Dollars ($300,000.00).

2. *Place of Payment.* The principal hereof and the interest hereon shall be payable at the principal office of the Company (presently in the Village of Chadwicks, New York) or at such bank in the City of Utica, New York as from time to time the Company may designate.

3. *Denominations.* The Debentures are issuable in multiples of Five Hundred Dollars ($500.00) and may upon reasonable request of the registered holder, be split into any number of pieces provided that no Debenture shall be issued in a denomination of less than Five Hundred Dollars ($500.00).

4. *Transfer.* No transfer hereof shall be valid unless made on the Company's books at the office of the Company by the registered owner hereof in person or by attorney, duly authorized in writing and similarly noted hereon.

5. *Default.* In case default shall be made in the payment of any installment of interest when the same shall become payable and such default shall continue for 30 days; or default shall be made in the payment of the principal of the Debentures when the same shall become due and payable either at maturity, by call for redemption, by declaration or otherwise; or default shall be made in the observance of any other covenants set forth herein and the Company shall not remedy such default within 10 days after notice in writing so to do; then, such default existing, the registered holder hereof shall have the right to declare the principal amount hereof, if not then due, immediately due and payable and shall have any and every remedy now or hereafter existing at law or in equity for the collection of the same with interest.

6. *Redemption at Company's Option.* The Debentures from time to time outstanding are subject to redemption prior to maturity at the election of the Company as a whole at any time or in part from time to time at par, with accrued interest to the date fixed for redemption.

7. *Mechanics of Redemption.* If less than all of the Debentures then outstanding are to be redeemed, the particular Debentures or portions thereof to be redeemed shall be selected by the Company by lot or by such other equitable methods as the Board of Directors of the Company may determine. Notice of redemption shall be mailed First Class Mail, postage prepaid, not less than 30 days prior to the redemption date, to the registered holder of a Debenture to be redeemed at his address appearing on the Registration Book for Debentures. Such notice shall specify the final date of redemption, the place at which Debentures shall be redeemed and, in case of Debentures which are not to be redeemed in their entirety, the portion thereof to be redeemed. On and after the date fixed for redemption of any Debentures or portion thereof, a notice of redemption having been given, such Debentures

(or portions thereof) shall become due and payable on such date, and if the funds necessary for the redemption thereof shall have been deposited or set aside therefor by the Company at the place where the same are redeemable, no interest shall accrue on or in respect of any such Debentures or portions thereof so called for redemption.

8. *Subordination.* The payment of the principal of, and interest on, the Debentures is subordinated in right of payment to the prior payment in full of all Senior Indebtedness, as hereinafter defined. Upon any distribution of the assets of the Company or upon any dissolution or total liquidation or reorganization of the Company, the holders of all Senior Indebtedness shall be entitled to receive payment in full, or have provision made for such payment, before the holders of the Debentures are entitled to receive any payment. Anything herein to the contrary notwithstanding, the Company may at any time, except during the pendency of dissolution or reorganization proceedings of the Company or except when any Senior Indebtedness is in default, make payments of principal and interest on the Debentures in accordance with their terms; provided, however, that no redemptions pursuant to Section 6 hereof shall be made without the prior written consent of the holders of all outstanding Senior Indebtedness.

9. *Definition of Senior Indebtedness.* The term "Senior Indebtedness," as used herein, shall mean the principal of, and interest on, indebtedness heretofore or hereafter incurred by the Company for money borrowed from banks, trust companies, insurance companies and other financial institutions and investing organizations, evidenced by notes, bonds, debentures or similar obligations and any and all renewals, extensions, refundings, amendments and modifications of any of the foregoing.

IN WITNESS WHEREOF, Brunner Air Compressor Corp. has caused this Debenture to be signed by its President, or one of its Vice Presidents, and its corporate seal to be affixed hereto and attested by its Secretary or an Assistant Secretary.

DATED: Sept. 3rd, 1964.

BRUNNER AIR COMPRESSOR CORP.

By (s) Wm. P. Cline
President

ATTEST:

(s) George W. Ledermann
Secretary